864 A.2d 1108

SANDRA G. CAPLAN, PLAINTIFF–RESPONDENT, v.
CRAIG CAPLAN, DEFENDANT–APPELLANT.

Argued September 27, 2004—Decided January 27, 2005.

*James P. Yudes* argued the cause for appellant.

*Dale E. Console* argued the cause for respondent.

Justice WALLACE delivered the opinion of the Court.

After substantially all of the issues in this matrimonial case were resolved, but prior to the completion of the extended trial of the child support and related counsel fee issues, defendant husband was discharged from his high-income employment position. The trial court found sufficient income from the parties' unearned income for the child support award and prorated child support on the basis of the parties' assets. The Appellate Division disagreed with this approach and concluded that the trial court should have imputed income to defendant before allocating the child support obligation for each party. We hold that even when there is sufficient investment income to satisfy a child support award, the court, in determining a party's child support obligation, should impute income based upon the party's past income or earning potential in order to fairly allocate the child support obligation.

## I.

Plaintiff Sandra Caplan and defendant Craig Caplan were married on April 17, 1988. The couple had two children, a son born in 1989, and a son born in 1991. The older son is developmentally delayed and suffers from Attention Deficit Hyperactivity Disorder (ADHD), fine and gross motor delays, and oral motor apraxia.

Both parties have post-graduate degrees. During the marriage defendant was employed as a mortgage trader. His annual earnings for the last five years of the marriage were:

1996: $ 1,796,326

1997: $ 2,434,773
1998: $ 1,093,531
1999: $ 2,945,454
2000: $ 4,615,273

Plaintiff, was not employed outside the home.

In January 1998, plaintiff filed a complaint for divorce and defendant filed an answer and counterclaim in March 1998. Through mediation, the parties were able to resolve tentatively all issues with the exception of child support and child support-related counsel fees. They entered into a settlement agreement dated January 30, 2001, which covered the issues of custody, parenting time, equitable distribution, and alimony. Pursuant to that agreement, plaintiff received a lump sum cash payment of $2,075,000, title to the mortgage-free marital home valued at $910,000, the furnishings in the home, and a Mercedes Benz automobile. Plaintiff waived alimony and any claim to the distribution of assets in return for the lump sum payment, and represented that the terms of the settlement agreement would permit her to live at a standard of living reasonably comparable to that achieved during the marriage.

As part of the agreement, defendant retained the Mercedes CLK, the Ford Expedition, and the following assets and listed values:

| Asset | Valve |
| --- | --- |
| Vanguard NJ Tax-Free Fund | $11,834 as of 6/30/00 |
| SSB 80941 | $2,490,272 as of 7/31/00 |
| 401K | $296,226 as of 3/31/98 |
| ESPP | Sold |
| Stock Incentive Plan | $134,689 marital value as of 8/31/00 per Kroll Lindquist Avey |

|  | $1,159,513 marital value of all plans below marked with (*) as of 3/31/98 per Compensation Resources, Inc. |
| Capital Accumulation Plan* | $11,103 marital value as of 8/31/00 per Kroll Lindquist Avey |
| Equity PSP Plan* | $7,015,333 marital value as of 8/31/00 per Kroll Lindquist Avey |
| Wealth Builder Option* | $4,704 marital value as 8/31/00 per Kroll Lindquist Avey |
| Rizzo & Bauer Escrow Account | $62,446.63 as of 12/22/00 |

On February 8, 2001, the trial court entered a final judgment for custody and parental time in accordance with the terms of the settlement agreement. The unresolved issues of child support and related counsel fees, were tried on April 30, May 2, June 5, and June 13, 2001.

Sometime between the execution of the settlement agreement and the conclusion of the trial, defendant lost his job. The terms of defendant's separation from his employment were outlined in a letter that indicated the parties had been negotiating the terms of the agreement since April 16, 2001, and that due to a reduction in force defendant would be terminated effective June 30, 2001. The letter stated that defendant would receive a severance package that included among other things the sum of $115,384.62, continued health care coverage for three months, and job placement services commencing on the effective date of the agreement.

On December 28, 2001, the trial court entered a judgment of divorce. The following month, the trial court decided the child support and related counsel fee issues. We quote from the

Appellate Division decision the pertinent findings of the lower court:

> Mr. Caplan was employed by Salomon Smith Barney from July 1987 until June 2001 as a mortgage trader. Mr. Caplan was terminated and a separation agreement signed.
>
> In the agreement, Mr. Caplan was provided with two months compensation after he actually left the trading desk, pre-tax severance pay in the amount of $115,000, and he retained deferred compensation, all of which had been included in the total of his income-producing assets. Mr. Caplan's current unemployment does not adversely affect his ability to support his two sons, Daniel and Jacob.
>
> Mrs. Caplan has not worked outside the home since the minor child Daniel was born, except for a brief period in 1999 when she earned $2,591.
>
> The parties' son Daniel is a special needs child. He is enrolled in a special education program in public school. He has been diagnosed with ADHD.
>
> Mrs. Caplan is a stay-at-home mother who spends her time helping her sons, especially Daniel, with important everyday activities.

\* \* \* \*

> Mrs. Caplan sold the former marital home for its worth [$910,000] and purchased her new home on Landow Road for $549,000. Her new home is smaller than the parties' marital home.
>
> Mr. Caplan has remained unemployed voluntarily since his termination. He is also living in his home in Maryland.

\* \* \* \*

> With regard to the Caplans' lifestyle during their marriage, Mrs. Caplan characterized their life together as an "upper-class standard of living" where they lived in a mortgage-free home of 4,000 square feet and drove BMW and Mercedes automobiles.
>
> The Caplans had live-in help, vacationed in Africa, Europe and Mexico and frequented Broadway shows and expensive restaurants according to Mrs. Caplan.
>
> Mr. Caplan characterizes the lifestyle of the parties as 'initially modest,' which in time became upper middle class. On account of his increased earned income, he described this lifestyle as comfortable and pleasant.
>
> While their marriage is at an end, both Sandra Caplan and Craig Caplan acknowledge that their family has been blessed economically, and each recognizes their shared and fundamental responsibilities for the support of their two beloved sons, Daniel and Jacob.

* * * *

The starting point in the court's analysis, in every case concerning an award of child support, is to be found in the child support guidelines enunciated in *Rule* 5:6A[.] . . .

* * * *

If the combined net income of the parents is more than $150,800 per year, the court shall apply the guidelines up to $150,800 and supplement the guidelines based award with a discretionary amount based on the remaining family income; for example, income in excess of $150,800, and the factors specified in *N.J.S.A.* 2A:34–23[a].

* * * *

Appendix IX–A also counsels that in situations where extreme parental income is involved, that although these guidelines apply to all actions to establish and modify child support awards, extremely low or high parental income situations make the Appendix IX–F awards inappropriate due to the limitations of the economic data.

Statutory analysis: Counsel for the parties agree, and the court so finds, in keeping with [*Walton v. Visgil,* 248 *N.J.Super.* 642, 649, 591 *A.2d* 1018 (App.Div.1991) ], that as the combined net Caplan family income exceeds $150,800 per year, the court must initially apply the guidelines maximum total child support for two children, and supplement this award with an additional support amount based upon the actual family income and the dispositive legislative factors set forth in *N.J.S.A.* 2A:34–23[a].

* * * *

This court finds and concludes that for purposes of calculating support for Daniel and Jacob Caplan, Mr. Caplan's income-producing assets total $4,539,476, and those of Mrs. Caplan are $2,415,964. This yields a shared responsibility child support obligation ratio of 65.18 percent for Mr. Caplan and 34.82 percent for Mrs. Caplan.

The court further finds that as the combined net income of the Caplan family clearly exceeds $150,800 per year, the dispositive legislative factors set forth in *N.J.S.A.* 2A:34–23[a] require this court to supplement the [ruled-based] maximum total child support for two children with an additional support payment based upon these factors and the actual family income.

A review of the pertinent expenses contained in Schedules A, B and C of the submitted case information statements is initially required. This court reaches today's conclusions based upon a specific review of the particular expenses contained in these statements that are clearly applicable to Daniel and Jacob.

Generally, Mr. Caplan shall be obligated to pay a specified portion of Schedule A and Schedule C expenses presented in Mrs. Caplan's submissions.

While Mrs. Caplan contends that two-thirds of her case information Schedule A expenses are attributable to Daniel and Jacob, the court declines to embrace this proposition and underscores that expenses for taxes, insurance, repairs, garbage, snow removal, lawn care, exterminator and plumbing remain solely Mrs. Caplan's and are not fairly attributable to the children.

Accordingly, Mr. Caplan shall be obligated for the sum of $486.54 per month which represents 65.18 percent of the total Schedule A expenses of $746 which are properly related to the children and include heat, electric and gas, water and sewer, phone and television. These expenses total $746 per month. Thus, 65.18 percent, or $486.54, remain Mr. Caplan's obligation.

In addition, the court finds and concludes that the Schedule C expenses of Mrs. Caplan's submission provide a fair and accurate estimation of Daniel and Jacob's monthly requirements.

These Schedule C child expenses total $7,525. Mr. Caplan's portion of this total is $4,904.80, which represents 65.18 percent of the total Schedule C expenses for his two sons.

Furthermore, while Mrs. Caplan suggests that one hundred percent of the Schedule B expenses are attributable to their children, this court finds and concludes they remain the sole responsibility of Mrs. Caplan.

Thus, this court finds, concludes and orders that Mr. Caplan's total child support obligation [is] $5,391.34 per month, or $1,253.80 per week. This sum is arrived at by adding the sums of $486.54 and $4,904.80, [totaling] $5,391.34, and dividing this total by 4.3.

This support obligation yields an amount, which comports with the directives of the child support guidelines calculations for extreme parental income situations.

This court further concludes, finds and orders that ... Mr. Caplan shall be responsible for 65.18 percent of [the following] obligations, and Mrs. Caplan shall be responsible for 34.82 percent of them:

A. Medical insurance and unreimbursed medical expenses for Daniel and Jacob;

B. The boys' summer camp;

C. Dental expenses, including orthodontia for Daniel and Jacob;

D. The bar mitzvah expenses for each child;

E. The $10,000 contribution to each of the boys' UGMA accounts;

F. Jacob Caplan's college and miscellaneous educational cost not covered by his UGMA account;

G. Daniel's post-secondary education and training costs.

[*Caplan v. Caplan*, 364 *N.J.Super.* 68, 77–79, 834 *A.2d* 459 (2003).]

On February 20, 2002, the trial court entered a supplemental judgment memorializing its decisions as follows:

1. Effective January 16, 2002, defendant shall pay child support to plaintiff in the amount of $5,391.34 per month, allocated $2,695.67 per child;

2. Plaintiff shall pay 34.82 percent, and defendant 65.18 percent, of the following expenses on behalf of the children:

a. Medical insurance, which will be maintained by defendant, and unreimbursed medical expenses, including hospital, prescriptions, psychiatric, and counseling costs;

b. Summer camp;

c. Dental expenses, including orthodontia;

d. Bar Mitzvah expenses;

e. $10,000 annual contribution to each child's UGMA account;

f. Jacob's college, graduate school and miscellaneous educational costs not covered by his UGMA account;

g. Daniel's post-secondary education, training costs, health insurance and residential expenses;

3. Daniel's current UGMA shall be placed in a Special Needs Trust and defendant shall provide plaintiff with trust statements twice each year, with the costs of the trust to be borne by the parties in accordance with their respective percentages;

4. Defendant shall manage Jacob's UGMA account and his Special Needs Trust, and provide plaintiff statements twice each year;

5. Defendant shall be responsible for complying with applicable tax laws on behalf of Daniel and Jacob;

6. Plaintiff shall claim both children as dependents for tax purposes;

7. Each party shall maintain a life insurance policy on his or her life in the amount of $1,000,000, with the children as equal beneficiaries, with the other party named as trustee. Upon emancipation of one child, the policy coverage may be reduced by $500,000;

8. Plaintiff's application to require defendant to purchase an automobile and provide automobile insurance for each child upon reaching the child's seventeenth birthday is denied without prejudice;

9. Plaintiff's application to require defendant to devise and bequeath all assets set forth on his case information statement to the children is denied; and

10. Each party shall pay their own respective counsel fees.

[*Id.* at 76–77, 834 *A.*2d 459.]

Both parties sought reconsideration. Defendant claimed the court miscalculated the personal expenses of the children and that other expenses were counted twice. He sought to have his monthly support obligation reduced from $5,391.34 to $3,815.29. Plaintiff sought an increase in child support to $9,931.77 per month based on her projected expenses for the children or alternatively to increase defendant's child support obligation by $1,416.01, taking into consideration the additional shelter and transportation costs attributable to the children. Plaintiff also requested that the court impute annual income of $3,800,000 to

defendant and reduce her assets by $1,000,000, the amount of the alimony buyout under the settlement agreement.

In her supporting certification, plaintiff asserted in part:

At the time of the trial, the defendant was recently unemployed. His employment terminated June 30, 2001. It is almost one full year, and the defendant is still voluntarily unemployed. There is no dispute that the defendant is fully capable of working. I suspect that with the losses of September 11th, the defendant could return to the brokerage market and essentially "write his own ticket." Attached hereto as Exhibit C are the first two pages of our 1999 and 2000 tax returns. I have never seen the defendant's 2001 tax return. In 1999, the defendant's W-2 income was $2,945,454, and in 2000 it was $4,615,273. The average of those two years is $3,800,000. I respectfully request that the court reapportion our respective percentages by imputing $3,800,000 of income to the defendant.

Both parties also sought counsel fees.

By an order dated May 15, 2002, the trial court essentially denied both motions for reconsideration. However, the trial court did eliminate defendant's obligation to pay his share of the summer camp, dental, and medical expenses because those items were included in the child support award.

Both parties appealed. In a published opinion, the Appellate Division disagreed with the methodology of the trial court in computing the child support award. The panel instructed the trial court to, first, determine the reasonable needs of the children; second, before allocating the appropriate share between the parties, consider, in addition to unearned income from investments, the ability of the parties to earn income; third, upon determining the respective percentages that each party's net imputed earned and unearned income bears to the total of their combined income, apply those percentages to determine each party's share of the maximum basic child support guideline award for two children; fourth, subtract the maximum basic child support amount from the court-determined amount of the reasonable needs of the children to determine the remaining support to be allocated between the parties. The panel noted that in performing that analysis, the trial court must review the factors enumerated in *N.J.S.A.* 24:34–23(a), and determine each party's responsibilities for satisfying those remaining needs. The panel also reversed the denial of

counsel fees to plaintiff and remanded that issue for further consideration and an analysis of the factors set forth in *Rule* 5:3–5(c) and *Williams v. Williams*, 59 *N.J.* 229, 281 *A.*2d 273 (1971).

We granted defendant's petition for certification. 179 *N.J.* 309, 845 *A.*2d 134 (2004).

## II.

Defendant argues that the law does not require a noncustodial parent to be employed. Rather, the law merely requires that a parent meet his or her financial obligation of support commensurate with the children's reasonable needs and/or marital lifestyle. He maintains that where each party has sufficient income-producing assets to continue their marital lifestyle without working, the courts should not impute income. Defendant points out that there is a common theme in all cases imputing income—that the obligor could not remain idle to avoid his or her child support obligation. Defendant urges that he is not remaining idle to avoid his support obligation because he can meet it without working. Defendant further contends that when the Appellate Division ordered that income be imputed to him, it unfairly shifted the burden to maintain the children exclusively to him. Additionally, he urges that when the Appellate Division directed the trial court to consider plaintiff's shelter and transportation expenses, it went beyond the case law and afforded plaintiff an economic windfall.

Plaintiff, in contrast, argues that the Appellate Division applied the proper standards and the decision below should be affirmed. She contends that the child support guidelines require the court to consider all income, earned and unearned, and if the court finds that either parent is voluntarily unemployed without just cause, it should impute income to that parent. She maintains that defendant should not be able to reduce his percentage of his child support obligation by simply refusing to return to work. Finally, she urges that the Appellate Division properly directed the trial court to include a portion of her shelter and transportation costs because those costs are partially attributable to the children.

## III.

We first address whether the trial court should impute earned income to a party when the unearned income of that party is sufficient to meet the reasonable needs of the children. Preliminarily, we note that contrary to defendant's assertion, the Appellate Division decision did not require defendant to seek employment. Rather, the panel held that in considering the allocation of support, the trial court should impute income when a defendant voluntarily remains out of the workforce.

Our rules require that the trial court apply the child support guidelines (the guidelines) when considering child support; however, the court may modify or disregard the guidelines where good cause is shown. *R.* 5:6A. "Good cause shall consist of a) the considerations set forth in Appendix IX–A, or the presence of the other relevant factors which may make the guidelines inapplicable or subject to modification, and b) the fact that injustice would result from the application of the guidelines." *Ibid.* The determination of good cause lies within the "sound discretion of the court." *Ibid.* Moreover, if the guidelines are not applied, or if the guidelines-based award is adjusted, the reason for the deviation must be explained. *Ibid.*

The guidelines were developed to give the court clear economic information in determining initial or modified" fair and adequate child support awards." Child Support Guidelines, Pressler, *Current N.J. Court Rules,* Appendix IX–A to *R.* 5:6A ¶ 1 at 2507 (2005). "The economic data and procedures of these guidelines attempt to simulate the percentage of parental net income that is spent on children in intact families." *Ibid.* The guidelines assume that the parents are sharing in the child-rearing expenses in proportion to their relative incomes and that those percentages are based on the combined net income of the parents. The guidelines generally define "net income" as "gross income minus income taxes, mandatory union dues, mandatory retirement, previously ordered child support orders, and, when appropriate, a theoretical child support obligation for other dependents." *Id.* at

2516. Gross income includes "all earned and unearned income that is recurring or will increase the income available to the recipient over an extended period of time." Pressler, *supra,* Appendix IX–B to *R.* 5:6A at 2532.

█ It is obvious that the "fairness of a child support award is dependent on the accurate assessment of a parent's net income." Pressler, *supra,* Appendix IX–A to *R.* 5:6A ¶ 12 at 2516. To assist in determining that assessment, the guidelines provide that:

If the court finds that either parent is, without just cause, voluntarily underemployed or unemployed, it shall impute income to that parent according to the following priorities:

a. impute income based on potential employment and earning capacity using the parent's work history, occupational qualifications, educational background, and prevailing job opportunities in the region. The court may impute income based on the parent's former income at that person's usual or former occupation or the average earnings for that occupation as reported by the New Jersey Department of Labor (NJDOL);

b. if potential earnings cannot be determined, impute income based on the parent's most recent wage or benefit record (a minimum of two calendar quarters) on file with the NJDOL (note: NJDOL records include wage and benefit income only and, thus, may differ from the parent's actual income); or

c. if a NJDOL wage or benefit record is not available, impute income based on the full-time employment (40 hours) at the New Jersey minimum wage ($5.15 per hour).

In determining whether income should be imputed to a parent and the amount of such income, the court should consider: (1) what the employment status and earning capacity of that parent would have been if the family had remained intact or would have formed, (2) the reason and intent for the voluntary underemployment or unemployment, (3) the availability of other assets that may be used to pay support, and (4) the ages of any children in the parent's household and child-care alternatives. The determination of imputed income shall not be based on the gender or custodial position of the parent. Income of other household members, current spouses, and children shall not be used to impute income to either parent except when determining the other-dependent credit. When imputing income to a parent who is caring for young children, the parent's income share of child-care costs necessary to allow that person to work outside the home shall be deducted from the imputed income.

[*Id.* at 2516–17.]

Thus, in "extreme parental income situations" modification is authorized. *Id.* at 2526. Extreme parental income situations are defined as either (a) obligors with net income below the U.S.

Poverty Guideline (low-income situations), or (b) parents with a combined net annual income in excess of $150,800 (high-income situations). *Ibid.*

■ The present case concerns a high income situation; therefore, "the court shall apply the guidelines up to $150,800 and supplement the guidelines-based award with a discretionary amount based on the remaining family income (i.e., income in excess of $150,800) and the factors specified in *N.J.S.A.* 2A:34–23." *Ibid.; see Connell v. Connell,* 313 *N.J.Super.* 426, 431, 712 *A.*2d 1266 (App.Div.1998). Thus, the appropriate approach is to use the guidelines for the combined net income of $150,800 and to consider the factors delineated in *N.J.S.A.* 2A:34–23(a), for an additional discretionary child support award. This combined approach should result in a fair award of child support that is in the best interest of the child.

When it is necessary to go beyond the guidelines, the court shall consider, but not be limited to, the following factors:

(1) Needs of the child;

(2) Standard of living and economic circumstances of each parent;

(3) All sources of income and assets of each parent;

(4) Earning ability of each parent, including educational background, training employment skills, work experience, custodial responsibility for children including the cost of providing child care and the length of time and cost of each parent to obtain training or experience for appropriate employment;

(5) Need and capacity of the child for education, including higher education;

(6) Age and health of the child and each parent;

(7) Income, assets and earning ability of the child;

(8) Responsibility of the parents for the court-ordered support of others;

(9) Reasonable debts and liabilities of child and parent; and

(10) Any other factors the court may deem relevant.

[*N.J.S.A.* 2A:34–23(a).]

We have noted that "[t]he key to both the [g]uidelines and the statutory factors is flexibility and the best interest of children." *Pascale v. Pascale,* 140 *N.J.* 583, 594, 660 *A.*2d 485 (1995).

Our discussion thus far does not answer the question whether income should be imputed to a party who can meet his support

obligation without the imputation of additional income. To be sure, in the present case, voluntary unemployment by defendant was not initially a factor because at the time the parties negotiated their settlement agreement, defendant was employed earning a substantial income. He was separated involuntarily from his position after the settlement agreement was executed but prior to the trial court receiving all of the evidence on the child support and related counsel fee issues. Nevertheless, because defendant had not sought reemployment by the time the trial court rendered its decision, and in fact, indicated he had no present plans to seek reemployment, the record is clear that defendant essentially was unemployed voluntarily. Further, it is not disputed that all of the reasonable needs of the children may be met by simply considering the unearned income of the parties. That is the approach the trial court utilized when it decided to consider the assets of the parties in fixing the percentages of the child support award.

■ We acknowledge that the trial court's decision to address child support without imputing income under the circumstances here was not unreasonable. However, we find that the trial court failed to give proper weight to the underpinnings of the guidelines that are based on the total income of an intact family. We are unable to conclude that it is a fair result only to use unearned income and the underlying assets merely because the income from those assets will satisfy a child support award. As outlined by Judge Fall in the Appellate Division, because of the necessity to allocate the reasonable needs of the children between the parents in a fair manner, "[i]t would be inequitable to allocate those needs simply based upon an analysis of unearned income, since one or both parents would thereby have the ability to decrease their respective responsibility for the children's needs by simply not working and avoiding imputation-of-income principles." *Caplan, supra,* 364 *N.J.Super.* at 88, 834 *A.*2d 459.

■ We repeat that the guidelines are developed based on the net income of an intact family. Pressler, *supra,* Appendix IX–A to *R.* 5:6A at 2507. The imputation of income, even when it is not

needed to meet the child support obligation, is consistent with that rationale. That is, the court should consider the manner in which the parents chose to support the intact family to assist in its determination of a fair allocation of child support when the family is no longer together. We conclude that the imputation of income to one or both parents who have voluntarily remained underemployed or unemployed, without just cause, will promote a fair and just allocation of the child support responsibility of the parents.

In determining whether to impute income, the guidelines instruct that the trial court must first determine whether the parent has just cause to be voluntarily unemployed. In making that decision, the court should consider the employment status and earning capacity of that parent had the family remained intact; the reason for and intent behind the voluntary underemployment or unemployment; the extent other assets are available to pay support; and the ages of any children in the parent's household as well as child-care alternatives. Pressler, *supra*, Appendix IX–A to *R.* 5:6A ¶ 12 at 2517. Additionally, factors such as previously announced plans to retire at an early age, health of the parties, whether one party would remain out of the workforce to care for the children, and other similar considerations that the intact family had or would have contemplated, should be considered by the trial court in making the "just cause" determination.

Our case law has consistently held that when a parent, without just cause, is voluntarily unemployed or underemployed, income may be imputed to that parent to provide for the child's needs. *See, e.g., Tash v. Tash,* 353 *N.J.Super.* 94, 99, 801 *A.2d* 436 (App.Div.2002) (noting that both the guidelines and case law of this State permit imputation of income when determining child support obligations); *Halliwell v. Halliwell,* 326 *N.J.Super.* 442, 448, 741 *A.2d* 638 (App.Div.1999) (stating that "[t]he potential earning capacity of an individual, not his or her actual income, should be considered when determining the amount a supporting party must pay"); *Dorfman v. Dorfman,* 315 *N.J.Super.* 511, 516–17, 719 *A.2d* 178 (App.Div.1998) (noting that although imputation

of income rules apply when determining child support, involuntary termination of employment must be considered when deciding whether a parent's income level equates to that parent's ability to earn); *Connell v. Connell,* 313 *N.J.Super.* 426, 433–34, 712 *A.*2d 1266 (App.Div.1998) (noting that a court may consider the capacity to produce income when computing a child support obligation); *Bencivenga v. Bencivenga,* 254 *N.J.Super.* 328, 331, 603 *A.*2d 531 (App.Div.1992) (stating the fact that a court will not order a parent to work does not mean that it cannot impute income to that parent); *Weitzman v. Weitzman,* 228 *N.J.Super.* 346, 354, 549 *A.*2d 888 (App.Div.1988) (recognizing the right of courts to realistically appraise a parent's earning capacity in determining child support), *certif. denied,* 114 *N.J.* 505, 555 *A.*2d 623 (1989); *Lynn v. Lynn,* 165 *N.J.Super.* 328, 340–41, 398 *A.*2d 141 (App.Div.) (noting that in setting child support, the court has the right to appraise the supporting parent's earning capacity), *certif. denied,* 81 *N.J.* 52, 404 *A.*2d 1152 (1979). In each of the above cases, income was imputed to a parent who claimed an inability to pay. Although that is not the same as the situation we face here, we are convinced that the imputation of income approach will have the salutary effect of promoting a fair and just allocation of the support obligation.

We expressed a similar view in *Miller v. Miller,* 160 *N.J.* 408, 734 *A.*2d 752 (1999), an alimony case. In *Miller, supra,* an unemployed husband with a substantial underperforming portfolio sought modification of his alimony obligation. 160 *N.J.* at 415, 734 *A.*2d 752. Although we did not impute income from employment to the husband because he was involuntarily unemployed, we imputed income earned from his long-term corporate bonds because "justice cannot 'sit . . . by and be flaunted in case after case before a remedy is available.'" *Id.* at 424, 734 *A.*2d 752 (citation omitted). We explained that the husband "could invest his principal differently in higher yield investment options available to him, much in the same way that an underemployed spouse could obtain a higher paying job available to him to make a more productive use of his human capital." *Id.* at 423, 734 *A.*2d 752. We conclud-

ed that "it [wa]s appropriate to impute a reasonable income from [the husband's] investments comparable to a prudent use of his investments, like his human capital." *Id.* at 424, 734 *A.*2d 752.

In the present case, defendant's ability to earn income, or in the terms of *Miller,* his human capital, is dormant, without a present return. We think it fair that defendant's dormancy be theoretically activated for the purpose of evaluating his support obligation and that that income should be imputed to him. In short, we conclude the imputation of income to defendant comports with the underpinnings of the guidelines that the children are entitled to share in the total income of an intact family and that defendant's imputed income should be included in the calculation of his child support contribution.

## IV.

Once the trial court decides that income should be imputed, the next step is to determine the reasonable amount of income to be imputed to that party. In performing that function, the court should apply the factors listed in the guidelines as well as any other evidence related to each party's ability to earn income. That evidence includes a party's responsibility for care of children, and, in particular, the care required for any special-needs child. Next, the trial court should combine each party's earned or imputed income with each party's unearned income and then calculate the percentage that each party's total income bears to the total of their combined income. Those percentages shall be applied to the guidelines to determine each party's share of the maximum basic child support guideline award.

Currently, the maximum basic child support guideline award for two children is $654 per week. Pressler, *supra,* Appendix IX–F to *R.* 5:6A at 2588. When the combined net income of the parties exceeds the maximum income under the guidelines of $150,800, the court must also consider the factors set forth in *N.J.S.A.* 2A:34–23, and any other relevant factor. Prior to the

adoption of the child support guidelines in 1986, the trial court had a great deal of discretion in determining the amount of a child support award. *See, e.g., DeVita v. DeVita,* 145 *N.J.Super.* 120, 123, 366 *A.*2d 1350 (App.Div.1976). Now, that discretion is limited essentially to cases where the combined net income of the parties exceeds the maximum income under the guidelines. Under those circumstances, the trial court must consider the factors set forth in *N.J.S.A.* 2A:34–23(a) to determine the amount of the supplemental support award and then combine that amount with the guidelines-based award. *Pascale, supra,* 140 *N.J.* at 594–95, 660 *A.*2d 485.

The approach described by the Appellate Division is an appropriate one. *Caplan, supra,* 364 *N.J.Super.* at 86–90, 834 *A.*2d 459. Briefly, that approach requires the trial court to calculate a fair and reasonable child support amount under *N.J.S.A.* 2A:34–23(a) as if the guidelines were not in place. Next, as the panel described it,

> the maximum basic child support amount, here $654 per week, or, $2,834 per month, should be subtracted from the court-determined reasonable needs of the children to determine the remaining children's needs to be allocated between the parties. Then, the court must analyze the factors outlined in *N.J.S.A.* 2A:34–23(a) and determine each party's responsibility for satisfying those remaining needs. It is the result of that analysis that is to be utilized when determining the fair and equitable allocation of the remaining needs of the children between the parties.
>
> [*Id.* at 90, 834 *A.*2d 459.]

Moreover, as the Appellate Division stressed, because the income and assets of each party are only two of the many statutory factors the trial court must consider in determining a fair and just child support award, the allocation equation utilized under the guidelines-based award has little or no application to the amount of additional support determined through analyzing the *N.J.S.A.* 2A:34–23 factors.

■ While we approve of that procedure, we recognize that it is not the only one available for application by the trial court. In an appropriate case, after assessing the *N.J.S.A.* 2A:34–23 factors, the trial court may determine that a reasonable approach would be to consider certain categories of expenses that are partially included in the guidelines award and add a portion of those expenses to the maximum guidelines-based award to arrive at a fair child support award.

For example, if the evidence showed that the children were active in extracurricular activities and that the custodial parent incurred significantly higher transportation expenses and activities fees for those activities, but otherwise the reasonable needs of the children would be covered by the guidelines-based child support award, the court could calculate a fair additional support amount for those two categories. After determining the fair allocation between the parties to meet the incremental child support needs, the court would then add the noncustodial parent's share of that discretionary allocation to the maximum guidelines-based child support to arrive at the noncustodial parent's total child support obligation. That approach would also result in a fair calculation of child support.

■ We leave to the trial court's discretion the choice of the methodology to employ in arriving at a child support award when the total income of the parties exceeds the guidelines. Under either method, the trial court's goal is to calculate a child support award that is in the best interest of the child after giving due consideration to the statutory factors and the guidelines.

## V.

We affirm the judgment of the Appellate Division and remand for recalculation of defendant's child support obligation.

*For affirmance and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE

and RIVERA–SOTO—7.

*Opposed*—None.