**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3865-21

DANIELA SIMMONS,

    Plaintiff-Respondent,

v.

KURT SIMMONS, JR.,

    Defendant-Appellant.

_____

> Submitted December 12, 2024 – Decided January 17, 2025
>
> Before Judges Natali, Walcott-Henderson and Vinci.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No, FM-03-0739-20.
>
> Kurt Simmons, Jr., appellant pro se.
>
> Law Offices of Thomas J. Hurley, LLC, attorneys for respondent (Thomas J. Hurley, on the brief).

PER CURIAM

    Defendant Kurt Simmons, Jr., appeals from the provisions of a May 9, 2022, amended dual final judgment of divorce (DJOD) entered after trial. He

contends the court committed error when establishing his alimony obligations to plaintiff, Daniela Simmons, and in its child support calculations. He further argues the court mistakenly failed to enforce an agreement outlining the parties' relative responsibilities for childcare expenses during the litigation and erred in equitably distributing the parties' assets. Defendant also maintains the court conducted the proceedings unfairly and was biased against him. Finally, defendant challenges the court's July 1, 2022, order denying his reconsideration application.

With the exception of the court's error in valuing two of the parties' bank accounts, we reject all of defendant's arguments. We accordingly affirm in part and reverse in part and remand solely for the court to correct the value of the disputed bank accounts and amend the equitable distribution award.

I.

We recount only those portions of the record necessary to resolve the limited issues before us. The parties married on August 13, 2010, and have two children, now ten and fourteen years old. The family lived together in a home secured by a joint mortgage until their separation in December 2019.

Plaintiff, who has an advanced degree, worked as a public school teacher during the marriage, with the exception of two absences of four months each

2

when she gave birth to the children. At the time of trial, plaintiff's contract provided for a base salary, plus a longevity bonus, and her 2019 and 2020 W-2 forms revealed gross annual incomes of $67,124 and $75,554, respectively. She also provided her most recent paystubs, from which the court calculated an annual income of approximately $87,900.

Defendant worked as a certified public accountant and became a partner at his then-current firm in June 2017. Unlike plaintiff, he failed to provide his most recent tax returns at the time of trial, but the parties' joint return from 2018 established he earned $318,583 in partnership income from his firm, and his final paystubs from 2019 and 2020 reflected annual incomes of $314,850 and $279,921, respectively. He moved to a new accounting firm in June 2021 as a partner and anticipated earning approximately $300,000 per year going forward.

As to the parties' standard of living, defendant testified during the marriage the family ordered out for pizza once a week but did not otherwise dine out, and shopped for clothing at "basic stores," though plaintiff recalled having dined out more frequently. The children attended public school and participated in several activities, including swimming, soccer, and acting. The family went on several vacations together, including to Georgia, Disney World, Turks and Caicos, the Dominican Republic, and Mexico. In the end, the parties'

A-3865-21

case information statements showed similar estimates of monthly expenses for the joint marital lifestyle—$18,082 in defendant's, and $18,968 in plaintiff's.

The parties separated in December 2019 following a verbal altercation and filed temporary restraining orders (TROs) against each other. They soon dismissed the TROs in favor of a civil restraints agreement which provided, in part, that the parties would share joint legal and physical custody of the children, and, as discussed in further detail below, neither would pay support to the other but would equally share responsibility for the children's expenses.

The agreement further provided for a "nesting arrangement," whereby the children would continue to reside in the marital residence, and plaintiff and defendant would each alternately live there half the time on a set schedule. But the parties adhered to that arrangement for only about eleven days before plaintiff moved out and established her own residence. Defendant testified at trial he had made all mortgage payments on the former marital residence since the filing of the divorce complaint and represents on appeal he continues to live there.

Both parties testified at trial, and the court found both to have been only "partially credible." It observed, while both "testified in an organized, clear, and straight-forward manner" on direct examination, their demeanors changed

4

on cross. In particular, the court found plaintiff's responses were sometimes "snarky," and she often had to acknowledge errors or omissions in some of her prior testimony or certifications. The court found defendant was able to recall many specific details without any need to refresh his memory on direct, yet, on cross, was unable to do the same and often gave "catty" responses. The court further recounted that the parties had generally been highly distrustful of each other during the litigation, which the record shows entailed frequent, acrimonious motion practice.

Ultimately, as discussed in further detail below, the court ordered an award of limited-duration alimony to plaintiff in the amount of $1,200 per week for six years. And, based on that figure along with its estimates of the parties' incomes, it calculated defendant's child support award to be $162 per week using the child support guidelines. It further effected an equitable distribution of the parties' marital property, including an equal division of the value of several bank accounts, which it determined totaled $133,256.12, as of the time plaintiff filed for divorce.

## II.

Appellate review of a judgment following a bench trial is limited. Seidman v. Clifton Sav. Bank, S.L.A., 205 N.J. 150, 169 (2011). The trial

court's factual findings are entitled to deference on appeal so long as they are supported by sufficient credible evidence in the record. Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 483-84 (1974). Such deference is particularly appropriate when those findings depend on the court's credibility determinations made with the benefit of its first-hand observation of witness testimony, Cesare v. Cesare, 154 N.J. 394, 412 (1998), or on its "'feel' of the case," State v. Johnson, 42 N.J. 146, 161 (1964). The court's "interpretation of the law and the legal consequences that flow from established facts," however, "are not entitled to any special deference," and are subject to de novo review on appeal. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

We first address, and reject, defendant's arguments the court abused its discretion in establishing defendant's alimony obligation. An alimony award is meant to assure a dependent spouse a level of "maintenance sufficient to support that spouse based on the living standards of the couple during marriage," Konzelman v. Konzelman, 158 N.J. 185, 195 (1999), and thus "permit[] a spouse or civil union partner 'to share in the accumulated marital assets to which he or she contributed.'" Cardali v. Cardali, 255 N.J. 85, 100 (2023) (quoting Konzelman, 158 N.J. at 195). It is an "economic right that arises out of the

marital relationship," id. at 100-01 (quoting Quinn v. Quinn, 225 N.J. 34, 48 (2016)), grounded in the recognition that "marriage is an economic and social partnership and that the financial and non-financial contributions of both spouses should be recognized," J.E.V. v. K.V., 426 N.J. Super. 475, 486 (App. Div. 2012).

As relevant here, for a marriage under twenty years in duration, "the total duration of alimony shall not . . . exceed the length of the marriage," absent exceptional circumstances that the parties agree do not apply here. N.J.S.A. 2A:34-23(c). In determining the appropriate length and amount of alimony, a court must consider the factors detailed in N.J.S.A. 2A:34-23(b).

In addition, the court should consider the

> practical impact of the parties' need for separate residences and the attendant increase in living expenses on the ability of both parties to maintain a standard of living reasonably comparable to the standard of living established in the marriage or civil union, to which both parties are entitled, with neither party having a greater entitlement thereto.
>
> [N.J.S.A. 2A:34-23(c).]

A court's decision whether to award alimony and, if so, its duration and amount, are left to the court's broad discretion, subject to the guidelines set forth above. Steneken v. Steneken, 367 N.J. Super. 427, 434 (App. Div. 2004), aff'd

7

as modified, 183 N.J. 290 (2005).  Consequently, the decision will not be disturbed on appeal unless it "clearly abused its discretion, failed to consider all of the controlling legal principles, made mistaken findings, or reached a conclusion that could not reasonably have been reached on sufficient credible evidence present in the record after considering the proofs as a whole." J.E.V., 426 N.J. Super. at 485.  We find no such abuse of discretion.

Here, the court noted the parties had been married for nine years and four months at the time of the complaint and that defendant and plaintiff were forty and thirty-nine years old, respectively.  It found neither suffered from any health issues that would affect their ability to earn income, and both were well-educated and working to their respective capacities.  Further, both shared joint legal and physical custody of the children and had "comparable" parental responsibilities, and they had both contributed to the marital enterprise and would be receiving assets in equitable distribution.

With regard to the marital lifestyle, the court recounted that defendant characterized it as "middle class" and "non-extravagant," while plaintiff believed it to be "upper middle class," pointing out the family vacationed often, dined at restaurants weekly, and bought expensive clothing.  Despite differences in the characterization of their marital lifestyle, the parties were

8

"pretty close" in the numbers they reported in their respective case information statements. That said, the court concluded, "[r]egardless of the 'label' assigned," neither party would likely be able to maintain a reasonably similar lifestyle going forward.

Moreover, given their significant income disparity, the court concluded plaintiff had established a need for support and defendant had an ability to pay. As for the balance of the statutory factors, including the tax treatment of any resulting alimony award, the court concluded they did not apply.

To determine the parties' relative incomes for support purposes, the court considered plaintiff's employment contract, as well as both parties' case information statements and available tax returns, W-2 forms, and paystubs, all as elucidated by the parties' testimony. While it recognized plaintiff's income had increased over the years pursuant to her employment contract, it concluded the appropriate figure would be $87,900, which it believed reflected her 2021 to 2022 compensation from all sources.

With respect to defendant, the court acknowledged his position that his income going forward would be about $300,000, but it noted he had failed to produce his tax returns for the 2020 tax year and that his year-to-date income for 2021 "lack[ed] significant documentation," precluding a comparison with

plaintiff's income that would genuinely be "apples to apples." In the end, the court observed from the available documentation defendant's income had fluctuated over the years and decided to use an "income-averaging approach" to arrive at a figure of $315,000.

Although the court acknowledged defendant's assertion the parties had a more modest joint lifestyle for most of the marriage than their budget reflected, the court found plaintiff's current budget was in any event "substantially lower than the joint marital lifestyle budget," and she clearly needed support to meet it. It concluded $1,200 per week would be a reasonable and necessary amount to help make up the difference. In that light, the court concluded its earlier decision to grant plaintiff pendente lite support had been inequitable, but noted granting a retroactive award, resulting in significant arrears on defendant's part, would not be equitable either. It believed the appropriate remedy would be to adjust the duration of alimony accordingly and found a term of six years appropriate.

Defendant takes issue with that determination on appeal on a number of grounds. First, he contends the court failed to analyze properly the statutory factors when establishing either the duration or amount of alimony. He asserts both parties were young and in good physical and emotional health, shared

10

parental responsibilities, and had joint physical custody of the children. Moreover, plaintiff was well-educated, fully qualified for her current position, and had been employed the full length of the marriage, except for only two brief absences for the birth of their children.

Defendant argues these factors weighed against a six-year term of alimony for only a nine-year marriage, and states the court provided "absolutely no explanation" for having chosen such a long term. He contends, without explanation, a more appropriate alimony award would have been $575 per month for four-and-a-half years, based on unspecified evidence in the record.

We reject all of these arguments. As detailed above, the court clearly analyzed the statutory factors at some length before reaching its decision. While defendant highlights certain statutory factors that may weigh against the court's alimony decision, the court was well within its discretion to conclude other considerations—particularly the significant disparity in the parties' incomes, plaintiff's need of support to meet her budget, and prior lack of such support during the litigation—justified the award it reached.

Defendant also argues the court failed to properly consider the parties' relative incomes and standard of living during the marriage. First, he asserts the court never ascertained his true income, accusing it of having ignored his

testimony, along with the parties' tax returns from the latter part of the marriage and the documentation for his 2020 and 2021 income that he did ultimately provide. He calculates his average salary throughout the length of the marriage as $176,255, far less than the $315,000 the court estimated.

As for plaintiff's income, defendant contends plaintiff's own evidence at trial established she would earn a base salary of over $95,000 for the 2021-2022 school year, with additional income from tutoring, committee work, and summer pay, and she would be entitled to annual salary increases thereafter pursuant to her contract. He further accuses her of concealing her summer pay by failing to produce her July 2021 paystub.

Defendant maintains that rather than based on the record and applicable law, the court's alimony award was essentially meant to "punish" him for his financial success. He emphasizes he was not a partner at his firm until the final years of the marriage, that the parties earned comparable incomes up until then, and, even once his own income increased, he had to save a large portion to pay taxes. Moreover, plaintiff never suffered any interruption in her career or wage loss due to the marriage. Again, we are unpersuaded.

Defendant is correct that alimony is meant to be "neither a punishment for the payor nor a reward for the payee," Aronson v. Aronson, 245 N.J. Super. 354,

364 (App. Div. 1991), but nothing in the court's decision suggests either was the case here. Rather, the court made clear the award was warranted in light of the parties' considerable income disparity, plaintiff's need for support, and defendant's ability to pay.

As for the underlying findings regarding the parties' incomes, those findings were adequately supported by the record. See Rova Farms, 65 N.J. at 483-84. The court was not bound to accept defendant's testimony regarding his income at face value, see Cesare, 154 N.J. at 412, and the parties' joint tax returns showed he had earned as much as $318,583 per year in partnership income, exceeding the figure the court ultimately used. Moreover, defendant himself testified at trial he expected to earn $300,000 per year in his current position, and, once he finally produced it, his 2021 tax return bore that out, showing an income from the partnership of over $305,000.

To the extent defendant argues the court should have considered the average of his income over the entire duration of the marriage, rather than his more recent income, the result would not have reflected his current actual ability to pay alimony, see N.J.S.A. 2A:34-23(b)(1). Further, defendant has not cited to anything in the record to support the income figures he uses for the earlier years he utilizes for his calculations. We note, on this point, defendant

acknowledges, at best, the court had access to only his tax returns for the last few years of the marriage at the time of trial.

Contrariwise, plaintiff produced her most recent returns, which coupled with her testimony, were consistent with the court's findings as to her income. Insofar as defendant accuses plaintiff of having concealed a portion of her 2021 income by withholding her then-most recent paystub, defendant fully explored that issue on cross-examination, and plaintiff explained the extra paystub would not have revealed any further earnings. We are satisfied the court considered all the parties' testimony and the evidence before making its detailed findings.

As noted, defendant had not explained his calculations and, again, failed to timely provide the tax documents that might have substantiated them. The 2021 returns he later produced, to be sure, show a considerable federal tax obligation and lesser obligations to New Jersey and several other jurisdictions. Those combined obligations, particularly after accounting for the credit defendant claimed on his New Jersey return for the taxes he paid to those other jurisdictions, do not explain adequately his calculations, however. At bottom, we are satisfied the court's decision was supported by the record available to it and warrants our deference.

Finally, defendant asserts the parties on average lived only a middle-class lifestyle, and he faults the court for focusing on their standard of living based on the most recent years of their marriage, rather than its total duration. But, as the court noted, whatever the appropriate characterization of the marital lifestyle, the parties largely agreed on the family's total budget in their case information statements, which reflected their standard of living during the final years of their marriage. Moreover, plaintiff's budget following the parties' separation was considerably less than the parties' earlier budget and the court designed the alimony award to satisfy that budget, not the joint one.

## III.

Defendant next contends the court abused its discretion in setting his child support obligation. Specifically, he argues the court's child support determination was impacted by the same purportedly flawed analysis of the parties' relative incomes that influenced its alimony determination. He maintains had the court calculated the obligation using the after-tax income figures he contends were appropriate, plaintiff would actually owe him support and have to cover the greater share of the children's unreimbursed medical expenses. He further argues the award was especially unreasonable given that the parties equally share custody of the children, defendant already covers a

15

larger share of their unreimbursed expenses, and he is "more involved" in their lives than plaintiff. Moreover, he asserts the obligation undermines his equal entitlement to maintain a lifestyle reasonably comparable to the marital one after divorce. We disagree with all of these arguments.

Parents share the responsibility to support their children. Pascale v. Pascale, 140 N.J. 583, 590-91 (1995). Allocation of that responsibility on divorce is ordinarily had by application of our child support guidelines, though a court "may modify or disregard the guidelines where good cause is shown." Caplan v. Caplan, 182 N.J. 250, 264 (2005).

However, where the parties' combined net income, as here, exceeds the maximum contemplated by the guidelines, the court should apply the guidelines up to that threshold and supplement the award to arrive at one that meets the children's reasonable needs in light of the family's standard of living during the marriage and the children's best interests. Isaacson v. Isaacson, 348 N.J. Super. 560, 580-81, 584 (App. Div. 2002). In setting such an award, the court must consider the applicable N.J.S.A. 2A:34-23(a) statutory factors, Caplan, 182 N.J. at 271, but the court's ultimate determination in that regard lies within its discretion and will be reviewed only for an abuse of that discretion on appeal. Id. at 264, 271.

A-3865-21

Here, the court applied the child support guidelines, using its income determinations of $1,690 and $6,058 per week for plaintiff and defendant, respectively, and the alimony award of $1,200 per week, to calculate a support amount of $162 per week for plaintiff, who was designated as the custodial parent. Although it acknowledged the parties' incomes exceeded the threshold for the guidelines, it declined to award any discretionary increase in light of the parties' shared custody arrangement and the amount of the alimony award.[1]

We are satisfied the court's findings as to the parties' relative incomes were adequately supported by the available evidence, Rova Farms, 65 N.J. at 483-84, and defendant does not dispute that the court properly applied the child support guidelines using those figures, Caplan, 182 N.J. at 264, 271.

---

[1] Although the court could have supplemented the resulting figure, given the parties' combined income exceeded the relevant threshold, Isaacson, 348 N.J. Super. at 584, neither plaintiff nor defendant challenges the court's order on that basis. In any event, the court adequately explained its decision not to do so. On this point, it found, "[w]hile the parties' net income exceed[ed] the Guidelines threshold, the [c]ourt will not apply a discretionary increase as a result of the parties' shared custody arrangement and the quantum of alimony being paid." Although the court did not explicitly address each statutory factor under N.J.S.A. 2A:34-23(a), as contemplated by Caplan, it is evident from our review of the record it considered them. For instance, the court thoroughly addressed factors (1), (2), (3), (4), (5), (6) and (9) under N.J.S.A. 2A:34-23(a), in the context of its analysis relating to "[s]upport and [r]elated issues." Finally, to the extent any modification may be necessary in the future when alimony ends, the court may always revisit the issue on an appropriate motion for modification.

IV.

Defendant next argues the court erred in failing to enforce the parties' agreement to equally share responsibility for the children's expenses during the litigation. Defendant maintains he provided documentation of his "exact expenses" encompassed by the agreement at trial and maintains the court failed to consider them when reaching its decision. He argues the court was bound to enforce the agreement as written, noting plaintiff never alleged he had engaged in fraud, coercion, or undue influence, and he was the one who had negotiated the agreement pro se while she was represented by counsel. Moreover, he asserts she should be estopped from failing to comply with the agreement because he maintains he had dismissed his TRO in reliance on enforcement of the agreement. Again, we disagree with these arguments.

Our courts observe a strong public policy favoring settlement, including of matrimonial disputes. Quinn, 225 N.J. at 44. Generally, a court will interpret a settlement agreement according to the intent of the parties and, so long as that intent is clear from the text of the agreement, will enforce the agreement as written. Id. at 45. It will not "rewrite a contract or grant a better deal than that for which the parties expressly bargained," absent "'unconscionability, fraud,

or overreaching in the negotiations of the settlement.'" Id. at 45, 47 (quoting Miller v. Miller, 160 N.J. 408, 419 (1999)).

That said, "'the law grants particular leniency to agreements made in the domestic arena' and vests 'judges greater discretion when interpreting such agreements.'" Id. at 45-46 (quoting Pacifico v. Pacifico, 190 N.J. 258, 266 (2007)). While such agreements, which are, after all, the product of mutual consent, "should not be unnecessarily or lightly disturbed," id. at 44, (quoting Konzelman, 158 N.J. at 193), they are nonetheless enforceable in equity only to the extent they are "fair and just." Dolce v. Dolce, 383 N.J. Super. 11, 20 (App. Div. 2006).

The civil restraints agreement here provided in relevant respect that "household expenses w[ould] be paid on an equal basis (including child expenses)." It further specified such expenses included those for the "mortgage, gym, Comcast, PSE&G, swimming, HOA, girls' college fund, car insurance, life insurance, MVP, Courtney school lunch, tuition, and groceries for the girls."

The court first addressed this provision in February 2020, less than two months after the parties signed the agreement. It denied a motion by plaintiff for pendente lite child support, noting the relatively recent agreement required

an equal division of childcare expenses, and concluded the parties should maintain the status quo and continue to split those costs equally. Additionally, it rejected plaintiff's request for pendente lite spousal support and explained:

> The [c]ourt has concerns about what has occurred. Again, the parties entered into a very specific agreement as to how finances were to be addressed on a pendente lite basis. The arrangements were based upon a nesting arrangement whereby, in essence, the parties would share equally custody of the children and expenses to maintain the "nest," i.e. the former marital home. Seemingly before the ink is dry on this agreement, [plaintiff] seeks to establish a separate pendente lite support.[ ]
>
> [(italicization omitted).]

That said, given plaintiff now maintained a separate residence, the court concluded the parties should, as a matter of equity, each pay the expenses associated with their own respective residences, rather than requiring plaintiff to equally share the costs of the marital residence on top of paying all the costs for her own.

Later, in February 2021, the court granted, in part, defendant's motion for reimbursement of half the children's expenses that had accumulated up to that point, finding no "adequate legal or factual basis to modify the [a]greement at th[at] time," but it deferred resolution of any specific reimbursement issues pending required mediation.

20

Defendant continued to pursue reimbursement, and, in its final decision, the court agreed that, although its February 2020 order had relieved plaintiff of any requirement to contribute to expenses for the former marital home, the order never modified her obligation to equally share the children's expenses. However, it found defendant's testimony and documentation of those expenses, which it noted identified certain retail establishments but was devoid of details regarding the purchases, failed to establish any viable basis for reimbursement. Aside from the children's college accounts, which the court addressed separately and are not the subject of this appeal, it found the amount defendant was requesting "inconsequential" in light of plaintiff's testimony to having made similar expenditures of her own without any pendente lite support from defendant.

Further, contrary to defendant's arguments, the court explicitly enforced the agreement in relevant respects. It merely found, based on a review of defendant's documentation and both parties' testimony, that defendant had shown no entitlement to reimbursement, because the parties had already made similar expenditures for the children despite plaintiff's lack of any pendente lite support. The court was not bound, as defendant's arguments presume, to accept his documentation not only at face value, but to the complete exclusion of

21

plaintiff's testimony regarding her own expenditures. We are satisfied the court's factual findings were clearly supported by the record and, again, warrant our deference. Rova Farms, 65 N.J. at 483-84.

V.

Defendant next argues the court abused its discretion in the equitable distribution of certain of the parties' bank accounts. As noted, we agree with defendant's arguments with respect to two of the parties' accounts and accordingly reverse and remand only for the court to correct its valuation error.

When dissolving the parties' marriage, the court must also effectuate an equitable division of the parties' marital assets and is required to identify which assets comprise the marital estate, determine their value, and make a fair and just allocation of them. Rothman v. Rothman, 65 N.J. 219, 232 (1974). A party seeking to shield any portion of an asset from equitable distribution bears the burden of establishing its immunity. Pacifico, 190 N.J. at 269.

In order to appropriately allocate marital assets deemed subject to distribution, the court must consider the factors enumerated in N.J.S.A. 2A:34-23.1, including, as pertinent here, the value of the property. The court's undertaking in that regard is not "mechanical," but must be sensitive to the equities of each particular case. Stout v. Stout, 155 N.J. Super. 196, 205 (App.

22

Div. 1977). Consequently, its decision is entrusted to its broad discretion, Steneken, 367 N.J. Super. at 435, and will not be disturbed on review so long as it "could reasonably have reached its result from the evidence presented, and the award is not distorted by legal or factual mistake," La Sala v. La Sala, 335 N.J. Super. 1, 6 (App. Div. 2000).

At issue here were five bank accounts, all in defendant's name—a TD Bank checking account; two Wells Fargo accounts, one checking and one savings; a Discover online savings account (Discover account 1);[2] and a Capital One money market account. The parties did not dispute that these assets, at least for the most part, were subject to equitable distribution and agreed they should be distributed according to their value on the date of the complaint. The court calculated their total value at $133,256.12 based on the closing balances reflected in their December 2019 statements, and concluded half, $66,628.06, should be distributed to plaintiff. Defendant also had two other accounts—a second Discover online savings account (Discover account 2) that defendant testified was used solely to pay taxes because his firm withheld nothing from his compensation and a TD Bank business checking account—which the court

---

[2] To preserve confidentiality pertaining to active financial accounts, we have omitted any reference to account numbers. See R. 1:38-7(e).

concluded, based on defendant's testimony, were immune from equitable distribution.

Defendant asserts the court erred in a very limited respect. First, with regard to the Wells Fargo checking account, he argues the court mistakenly used in its calculation the $11,708.59 beginning balance from the account's December 2019 statement rather than the $5,080.07 closing balance. Although the court's decision makes clear it intended to value the property as of the end of December, it appears to have used the December statement's opening, rather than closing balance in its calculations. That "factual mistake" warrants reversal and a remand to correct the error. See La Sala, 335 N.J. Super. at 6. The court made a similar error with respect to the Wells Fargo savings account, albeit in defendant's favor and with much smaller consequence, using the opening balance of $83.05, rather than the closing one of $109.06. On remand, the court should correct the equitable distribution award by $3,301.25, half the difference between the correct and incorrect figures.

With those lone exceptions, the court's decision on equitable distribution was adequately supported by the record. Next, although defendant acknowledges that Discover account 1 and the Capital One account were at least partially subject to equitable distribution, he asserts they already had balances

24

of $11,595.99 and $4,109.12, respectively, as of the date of marriage and earned a total of $1,054 in interest on those balances through date of complaint. He argues this combined $16,759.11 was never comingled with marital assets and should therefore have been immune from equitable distribution.

In support, defendant points to a statement for the Discover account 1 covering the third quarter of 2010, which shows a closing balance of $11,595.99. But he neglects to mention it includes deposits of $6,900 made in September of that year, after the parties were already married. Moreover, aside from the interest on that initial balance, defendant does not contest the rest of the funds in that same account, worth $117,688.96 as of the complaint, constituted marital property that was plainly comingled with the funds he now claims were immune from distribution. As for the Capital One account, defendant offers an August 2010 statement showing a closing balance of $4,109.12, but the December 2019 balance, the most he could shield from equitable distribution absent further explanation, was only $623.34. And even that figure included two deposits in the prior month alone from the Wells Fargo checking account that defendant does not dispute was subject to distribution, again undermining his assertion the funds were never comingled.

Defendant next asserts the December 2019 balance for Discover account 1 included $18,000 he had "inadvertently" transferred from Discover account 2. He claims he meant to transfer the money instead to his Wells Fargo account in anticipation of paying his taxes and that he corrected the mistake in January 2020 as soon as he discovered it. Because the court agreed Discover account 2 was immune from distribution, he reasons, the $18,000 he temporarily transferred from it to Discover account 1 should have been immune as well.

Defendant identifies statements from account Discover account 2 showing he made two transfers totaling $18,000 to Discover account 1 in November 2019 and another two sending the same amount back the following January. But, by his own account, he did not transfer any money to Wells Fargo until July, and, even once he did, it was an amount different than $18,000. There is no obvious connection among these transfers that would compel the conclusion the court operated under any mistake of fact, and defendant, who bore the burden of proof to demonstrate the funds were immune, Pacifico, 190 N.J. at 269, failed to satisfy that burden.

Last, defendant argues the $7,296 he paid in January and February 2020 to cover what he believes to have been the parties' joint obligations under the civil restraints agreement should have been excluded from the total value of the

26

distributed accounts. But he points to a summary showing that most of the expenses were for his own residence, which, as discussed above, the court was within its discretion to conclude he should be responsible for notwithstanding the agreement. As for any expenses for the children, he is correct that portion of the obligation was shared, but the court concluded, based on adequate evidence in the record, that the parties had already made equivalent expenditures in that regard, and defendant had shown no entitlement to reimbursement. That leaves only defendant's mortgage payments, which the court dealt with separately and gave him a credit, which defendant does not challenge on appeal.[3]

---

[3] Plaintiff also challenges the court's equitable distribution decision on two grounds. First, she argues the court erroneously excluded Discover account 2 from equitable distribution because defendant failed to timely produce his 2020 and 2021 tax returns substantiating that he actually used those funds to pay his taxes. Second, plaintiff contends the trial court "arguably . . . fail[ed] to include market forces in the distribution of retirement funds to [her]." We decline to address those arguments for two reasons. First, with respect to the court's decision regarding the retirement funds, it does not appear from our review of the trial record and plaintiff's cross-motion for reconsideration that plaintiff raised this issue with the court. Instead, she asserts it for the first time on appeal. Second, she has failed to cross-appeal. Under these circumstances, we decline to address plaintiff's arguments. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973); Reich v. Borough of Fort Lee Zoning Bd. of Adjustment, 414 N.J. Super. 483, 499 n.9 (App. Div. 2010) (explaining "a respondent must cross-appeal to obtain relief from a judgment").

A-3865-21

In sum, we are satisfied the court erred only with respect to valuing and distributing the Wells Fargo accounts. We reverse the court's order and remand for the limited purpose of reducing plaintiff's equitable distribution award by $3,301.25.

## VI.

In his final point, defendant contends he did not receive a fair trial because the judge made several derogatory remarks about accountants in his presence, violating the <u>Code of Judicial Conduct</u>, and further exhibited his bias in the adverse discretionary decisions related to its alimony, child support, and equitable distribution decisions. He asks that we reverse the court's orders and remand the matter for a new hearing and consideration by a different judge.

With respect to the court's alleged improper comments, defendant alleges during an early-morning pre-trial conference call on July 7, 2022, which was not transcribed, the judge made "numerous" offensive comments about those in defendant's profession, including that the judge "hate[d]" dealing with accountants as litigants, because "they make everything difficult." Defendant surmises the judge made these statements because he was under the misimpression he was speaking only with counsel on the call. Other than defendant's representation, the record contains no certifications or attested

statements from anyone else on the call corroborating defendant's version of the judge's comments.

On December 23, 2024, during the pendency of this appeal, defendant sought to supplement the record with a transcript from oral argument on a recent motion, an application we granted. That transcript reveals the judge acknowledged that he previously stated in his prior experience as a practicing attorney, he found accountants, along with engineers, lawyers, and doctors, to be "difficult clients . . . because they overthink things." The judge, however, expressly denied either having used the word "hate," or having treated defendant any differently because of defendant's profession, noting his own mother had been an accountant.

The Code of Judicial Conduct "is a general statement of standards and goals, admirably serving the purpose of providing guidance to judges in all matters precisely because of the generality of its provisions." In re Di Leo, 216 N.J. 449, 467-68 (2014) (quoting In re Alvino, 100 N.J. 92, 102 (1985)). Although judges must adhere to it, not every violation reflexively constitutes judicial misconduct or warrants discipline. Id. at 468. Likewise, "inappropriate comments do not, by themselves, necessarily equate to bias" warranting reversal. Panitch v. Panitch, 339 N.J. Super. 63, 68 (App. Div. 2001). Instead,

a claim of prejudice based on a violation of the code is reviewable on appeal "considering the entire transcript." Mercer v. Weyerhaeuser Co., 324 N.J. Super. 290, 298 (App. Div. 1999) (quoting State v. Zwillman, 112 N.J. Super. 6, 20 (App. Div. 1970)).

Applying these principles, and after having reviewed the entire record of the proceedings, we are convinced the court treated defendant fairly and addressed all the issues before him in an unbiased and conscientious manner. Indeed, in its thorough written decision, the court found both parties "partially credible" to a similar extent, and in particular credited defendant's explanation for his use of the Discover account to pay taxes, rendering it immune from equitable distribution. Simply put, we find nothing in the record to indicate the court was anything but fair to both parties and we are unpersuaded the judge's remark warrants reversal or reassignment of the matter.

The court's gratuitous and fleeting comment in the supplemented record does not support a contrary finding. First, as noted, other than defendant's characterization of the earlier call, there is nothing in the record, from any other percipient witness, attesting to defendant's version. And while it certainly would have been better practice for the court not to share its views as a practicing attorney, under the circumstances, and based on the entirety of the record, we

find no basis to conclude the court violated the <u>Code of Judicial Conduct</u>, or conducted the proceedings in a manner warranting the relief requested.

Finally, because defendant failed to demonstrate the court's decision denying reconsideration was "based upon a palpably incorrect or irrational basis," or "that the [c]ourt either did not consider, or failed to appreciate the significance of probative, competent evidence," <u>D'Atria v. D'Atria</u>, 242 N.J. Super. 392, 401 (Ch. Div. 1990), reconsideration was not warranted. Any argument made by plaintiff that we have not expressly addressed is without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed in part, reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3865-21