# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1823-24

L.A.,[1]

      Plaintiff-Appellant/
Cross-Respondent,

v.

E.K.,

      Defendant-Respondent/
Cross-Appellant.

_____

      Argued February 24, 2026 – Decided March 9, 2026

      Before Judges Firko and Perez Friscia.

      On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FD-14-0252-24.

      Bonnie C. Frost argued the cause for appellant/cross-respondent (Einhorn Barbarito Frost Botwinick Nunn & Musmanno PC, attorneys; Bonnie C. Frost and Jessie M. Mills, on the briefs).

---

[1] We use initials to protect the privacy and welfare of the parties' minor daughter who is the subject of this appeal. R. 1:38-3(d).

Kristen E. Marinaccio argued the cause for respondent/cross-appellant (Harwood Lloyd, LLP, attorneys; Michael J. Muller, on the briefs).

PER CURIAM

In this child relocation and custody case, plaintiff L.A. and defendant E.K. both appeal from a February 3, 2025 order as amended on February 4, 2025. After a plenary hearing with several witnesses testifying, the Family Part judge awarded the parties joint physical custody with equal parenting time of the parties' three-year-old daughter and granted defendant's opposed application to move to Connecticut with the daughter. The judge initially ordered that Connecticut would be the daughter's home state, and New Jersey would retain jurisdiction. On reconsideration, the judge amended her order, providing defendant would be designated as the parent of primary residence (PPR) and plaintiff the parent of alternate residence (PAR). The judge further ordered that despite granting the removal application, New Jersey would be regarded as the daughter's home state. We affirm.

I.

Factual Background

We summarize the facts developed in the record. The parties began a relationship and had a religious wedding ceremony in November 2021, but never

2

legally married. Around that time, they began living together in plaintiff's parents' home in Riverdale. Their daughter was born in New Jersey in November 2022.

Following allegations of domestic violence, on October 20, 2023, defendant obtained a temporary restraining order (TRO) against plaintiff along with temporary custody of the daughter. Defendant relocated with the daughter to Connecticut to live in her childhood home with her parents and three brothers.

<u>The Complaint and Consent Order</u>

Plaintiff filed his complaint on November 9, 2023. The parties entered a consent order on November 15, 2023, wherein defendant voluntarily dismissed her TRO. They agreed to share joint legal custody of the daughter. Relevant here, they agreed "[t]he home state of the child is New Jersey. All matters relative to custody, parenting time, and child support should be determined in the State of New Jersey." The consent order further provided that plaintiff would have supervised visitation with Family Matters and would have FaceTime calls with the daughter on the days when he did not visit with her. The parties agreed they would communicate utilizing the Our Family Wizard application. Defendant filed a counterclaim on January 11, 2024.

A-1823-24

<u>Parenting Time</u>

Following entry of the consent order, plaintiff participated in a substance abuse evaluation, which found substance abuse treatment was not necessary. However, he completed an anger management program. Plaintiff then sought additional parenting time, but defendant declined such request due to the ongoing investigation by the Division of Child Protection and Permanency (the Division). The record indicates the Division ultimately determined the allegations against plaintiff for neglect of the daughter were unfounded. Family Matters reported that plaintiff's supervised parenting time was successful.

As a result, the judge entered an order on January 24, 2024, providing that plaintiff would have unsupervised parenting time every other weekend on Saturday through Sunday, as well as one dinner visit during the week in Connecticut. The judge further ordered that a plenary hearing would be held regarding defendant's request to relocate permanently to Connecticut with the daughter.

On March 4, 2024, the judge entered an order awarding plaintiff additional parenting time, specifically unsupervised every other weekend from Friday night until Sunday. On April 8, 2024, the judge entered an order granting

plaintiff additional parenting time and granted him unsupervised parenting time every other weekend, from Friday through Monday.

On June 12, 2024, in the midst of the plenary hearing, the judge entered an order by consent awarding plaintiff parenting time from 1:00 p.m. on Fridays overnight until 1:00 p.m. on Mondays, apparently on every other weekend, with additional parenting time on the alternate weekends from Thursday at 1:00 p.m. until Saturday at 1:00 pm.

On July 4, 2024, consistent with the judge's order, plaintiff traveled to Connecticut to pick up the daughter for his parenting time, but defendant did not appear and consequently plaintiff was unable to see the daughter. According to defendant's counsel, defendant "misinterpreted" the June 2024 parenting time order.

The Plenary Hearing

The plenary hearing took place over eight days from May through August 2024. Plaintiff testified he has a bachelor's degree and worked for his father's construction company. He first met plaintiff in October 2018, when she was living in Connecticut, but beginning in March 2019 she began staying with him at his parents' home a few nights per week. Plaintiff testified that after defendant

moved into his family's home in November 2021, he helped her obtain a full-time job at UBS in Weehawken, and she had also worked as a makeup artist.

Plaintiff described the alleged domestic violence from October 2023, which began with the parties' dispute over taking the daughter to a pumpkin patch. He testified that defendant yelled at the daughter, and he got "mad." He stated that defendant put her fists on his leg and was "screaming . . . nonstop." Plaintiff denied causing defendant any injuries, specifically refuting that he grabbed her throat, pushed her on the couch, and pulled her hair.

Plaintiff testified that the morning after this incident, defendant left the daughter alone in the house for an hour without informing any of the other occupants. Thereafter, defendant told plaintiff's father that she wanted to move out, so plaintiff's father drove her to Connecticut. Subsequently, the police arrived at plaintiff's home and arrested him based on defendant's allegations of domestic violence, and the daughter went to stay with defendant in Connecticut.

Plaintiff testified that defendant's parents and three brothers lived in her family's four-bedroom home in Connecticut, and sometimes the brothers' paramours lived there as well. He expressed concern that defendant's family kept firearms in their home, her older brother had a drug problem, and her younger brother had "bipolar issues" and hit defendant. Plaintiff testified that

6

defendant told him she "hate[d] [her] family." He stated that there were "termites, ants, [and] leftover food" in her family's home. Plaintiff explained that he often sent messages via Our Family Wizard to defendant but would not get a response, which would make him concerned about the daughter's whereabouts. He testified that the drive from New Jersey to defendant's home in Connecticut took more than two-and-a-half hours.

Plaintiff stated that his family home, where he lived at the time of the hearing, had security cameras, a generator in case of a power failure, and child safety gates. He testified that the home had five bedrooms, including one solely for the daughter. Plaintiff clarified that he and his parents were the only occupants of the home. He testified that defendant did not contribute financially while living there. Plaintiff alleged that he owed his parents about $140,000.

Plaintiff testified that if he was granted custody, his mother, L.A., was available to watch the daughter while he was at work. Plaintiff claimed that he routinely bathed the daughter, changed her diapers, and clothes. He expressed a willingness to attend coparenting therapy.

Plaintiff represented that the parties had not yet decided if the daughter would attend preschool, and he was concerned about sending her to a preschool

A-1823-24

in Connecticut. He testified that if defendant moved to New Jersey, she could decide where to send the daughter to preschool.

Plaintiff stated that he provided health insurance for the daughter. According to plaintiff, the parties jointly selected Dr. Nilesh Jariwala in Wayne as the daughter's pediatrician, however, defendant unilaterally selected a new pediatrician in Connecticut and had the daughter's records transferred there over his objection. Regarding child support, plaintiff testified that defendant did not provide any financial data despite his counsel serving a notice to produce on plaintiff. He testified that his income in 2023 was $22,168.

Plaintiff's mother testified on his behalf. L.A. testified she had a good relationship with defendant and that she bought many things for defendant while she lived in her home. L.A. testified that she, her husband, and plaintiff paid for all of the daughter's expenses. L.A. testified that she cared for the daughter while defendant was at work and bathed her even when defendant was at home. L.A. stated that plaintiff, rather than defendant, woke up to care for the daughter at night.

L.A. testified that the parties took the daughter to Macedonia in the summer of 2023, and she and her husband paid for the trip. L.A. testified that the parties had a fight during this trip in which they yelled at each other, and

8

A-1823-24

defendant threw fruit at plaintiff. However, L.A. never observed plaintiff exhibit any physical violence toward defendant. L.A. testified that the parties had verbal altercations in October 2023, and defendant hit her with an object identified as a candle holder.

I.A., plaintiff's father, testified on his son's behalf. I.A. testified he worked as a mason and carpenter and that plaintiff worked with him. I.A. testified that plaintiff paid $750 per month to live in his home. I.A. explained that plaintiff owed him money for the wedding party and for a loan to pay his attorneys.

I.A. testified that his wife, L.A., watched the daughter while the parties worked. I.A. confirmed that if plaintiff was awarded custody, his wife would watch the daughter while plaintiff worked. I.A. stated that plaintiff fed the daughter and changed her diapers. I.A. testified that plaintiff did not use drugs or alcohol and never yelled at the daughter.

I.A. testified that he never observed physical violence between the parties but explained that the parties had a disagreement about taking the daughter to a pumpkin patch in October 2023, which escalated to the alleged domestic violence. According to I.A., defendant's allegations were false and fabricated. The following day, I.A. testified he drove defendant to her family's home in

Connecticut. The next day, the police came to his home, served the TRO, and arrested plaintiff. Defendant and her father were present, and the police transferred the daughter to them.

D.W., who operated Family Matters, testified on behalf of plaintiff. D.W. testified that the daughter responded positively to plaintiff and had no trouble separating from defendant. D.W. observed improvement in plaintiff's parenting skills. For example, he brought appropriate snacks, toys, and supplies to visits and engaged in activities with the daughter. D.W. testified she had no concerns about his ability to parent, the daughter's safety, or her well-being when spending time with plaintiff.

C.P., a police officer with the Riverdale Police Department, testified for plaintiff. C.P. testified that defendant came to the police department alleging domestic violence in October 2023, and he referred her to the courthouse to pursue a TRO.

### Defendant's Case

Defendant confirmed that the daughter was born in New Jersey, and the parties lived in plaintiff's parents' home at the time. In contrast to plaintiff's testimony, defendant described the alleged domestic violence in October 2023 and testified that after a disagreement about pumpkin picking, plaintiff grabbed

her by the neck, punched her twice, and pushed her onto a bed. Defendant claimed that after the alleged altercation, she had an argument with plaintiff's parents. Defendant testified that the following day, plaintiff "harass[ed] [her] all day," and when she returned home from work, he pulled out her hair extensions. Defendant also testified that plaintiff's mother "spit" at her.

Defendant testified that living with plaintiff and his family "was just very abusive," and he physically abused her "every few days." She stated that he was "controlling" and often showed "anger." Defendant testified that after disagreements with plaintiff's mother, L.A., plaintiff "called me disrespectful and was like hitting me." Defendant testified that plaintiff "would just like slap me or like punch me in like my arm or my stomach, or my thigh or like more places where you wouldn't really notice, or a lot of times it was like my hair." Defendant testified that plaintiff pushed and punched her in May and June 2022, causing bruises. She testified that he pushed, choked, and slapped her during a trip to Macedonia. Defendant added that plaintiff's mother once locked her grandson in a closet.

Defendant testified that she earned $55,000 per year at UBS before receiving a raise in March 2024, which increased her salary to $64,000. Defendant explained that she resigned from UBS in July 2024 because UBS

wanted her to work in the office four days per week. Defendant testified that she would seek another job.

Defendant testified that she and her family lived in a spacious home in a nice neighborhood in Connecticut, and this was a "more loving household" than plaintiff's. She explained that her mother, G.K., was available to assist with childcare. Defendant testified that the daughter was doing very well since moving to Connecticut. She stated that she took the daughter to a pediatrician in Connecticut for a routine visit and plaintiff objected.

Defendant testified that she was enrolled in therapy and expressed concern about the physical and emotional abuse in plaintiff's family's home. She expressed concern that plaintiff would try to "alienate" her from the daughter. Defendant described difficulties in picking up and dropping off the daughter and mentioned that plaintiff once followed her in his car. However, defendant testified that she would attempt to cooperate with plaintiff if she was permitted to remain in Connecticut with the daughter. Defendant admitted that she made a mistake as to the schedule for the July 4 weekend, which resulted in plaintiff missing his parenting time.

Defendant's mother testified on her behalf. G.K. worked as a registered nurse. G.K. testified that defendant returned to her home in October 2023,

"confused" and "scared" and that the daughter began living there the following day. G.K. testified that defendant and the daughter shared a room. G.K. testified that she works three days per week and coordinates childcare with defendant. G.K. testified that the daughter played with many activities in their home, she had no concerns about the daughter being left alone with anyone in their household, and nearby relatives were available for support. Photographs, plaintiff's U.S. passport, Google Maps listings, videos, a voice recording, and financial and other documents were received in evidence. The judge reserved decision.

## The Judge's Opinion

On August 15, 2024, the judge issued an oral decision. The judge found that plaintiff was "mostly credible" and visibly emotional. Similarly, the judge found that defendant was "mostly credible" but was evasive on cross-examination, which detracted from her credibility. The judge determined D.W. was credible, and that plaintiff's mother, L.A., was "mostly credible" but, like plaintiff, was "invested in the outcome of the trial." The judge found that plaintiff's father, I.A., was a "biased witness" but nonetheless credible. The judge noted defendant's mother, G.K., to be "very credible" but that she had an inherent bias.

The judge ruled that both parents would share joint physical custody with equal parenting time, and that "both can be the [PPR]."  The judge granted defendant's removal application, thus permitting defendant and the daughter to remain in Connecticut, but held that New Jersey would retain jurisdiction.

Regarding child support, the judge directed a calculation based on the last income defendant was earning prior to her raise, because the judge did not think defendant got the benefit or the raise.  The judge ordered imputation of plaintiff's income based on a minimum wage salary.  The judge instructed the parties to return to court to finalize a holiday schedule and child support.

<u>The October 4, 2024 Order</u>

On October 4, 2024, the parties returned to court.  The same day, the judge entered an order memorializing her August 15, 2024 oral opinion, stating that the parties would share joint legal custody and share "50/50 physical custody" of the daughter.  The order provided that "Connecticut will be the 'home state' for [the daughter]" but stated "New Jersey shall retain jurisdiction over [the daughter]" and "[a]ll matters relative to custody, parenting time, and child support shall be determined in the State of New Jersey."  Despite her oral opinion, the order did not expressly designate a PPR or PAR.

14

The order provided for an alternating weekly parenting time schedule with alternating holidays on an annual basis. Each party would have summer vacation time with the daughter. The parties were ordered to attend co-parenting therapy. The judge ordered that the parties would alternate claiming the daughter as a dependent on their income tax returns.

Regarding child support, the judge imputed income of minimum wage for forty hours per week to plaintiff and income of $50,000 per year to defendant. Using the Child Support Guidelines worksheet, the judge calculated child support of $27.50 per week to be paid by defendant to plaintiff effective August 15, 2024.

The judge ordered that Dr. Jariwala would remain as the daughter's pediatrician but permitted defendant to bring her to doctors in Connecticut in case of emergency. The judge directed communication via Our Family Wizard, ordered the parties to refrain from making negative or harassing statements about each other, and further ordered that they not follow or stalk each other.

### The October 21, 2024 Order

Following entry of the October 4, 2024 order, defendant's counsel wrote to the judge seeking clarification of her oral decision that the parties would share joint physical custody, both serve as PPR, New Jersey would retain jurisdiction,

and whether Dr. Jariwala would be the daughter's primary physician. Counsel further sought clarification that the New Jersey pediatrician would be the daughter's primary physician. On October 21, 2024, the judge entered an amended order confirming only the grant of defendant's removal application. The remaining terms of the prior order were unchanged.

Motions for Reconsideration

On November 11, 2024, plaintiff filed a motion for reconsideration of the October 21, 2024 order and sought an order identifying New Jersey as the daughter's home state. Defendant cross-moved for reconsideration regarding the grant of 50/50 physical custody and sought to be designated as PPR, retain New Jersey's jurisdiction, child support, and the pediatrician designation.

On January 31, 2025, the judge heard oral arguments on the parties' motions for reconsideration. Defendant's counsel noted that the daughter had lived in New Jersey for six months prior to the filing of the complaint in November 2023 and had only relocated to Connecticut in October 2023. The judge entered an order[2] on February 3, 2025, granting in part, plaintiff's request

---

[2] This order is captioned as an "amended order" and the judge's signature date is October 21, 2024, but it appears to be the order entered on reconsideration and is file-stamped February 3, 2025. We surmise that the judge reused the template from her October 21, 2024 order without updating this text.

for reconsideration and confirming that the parties would share joint legal and physical custody consistent with the October 21, 2024 order. However, the judge ordered that New Jersey would "retain jurisdiction as home state," consistent with the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), N.J.S.A. 2A:34-53 to -95, "because of the significant contacts" here.

Regarding defendant's motion for reconsideration, the judge held that despite the 50/50 custody arrangement, defendant would be designated as PPR and plaintiff would be designated as PAR. In addition, the judge denied defendant's request for additional parenting time once the daughter was enrolled in school, finding that this ruling should abide by the event because it was "completely hypothetical." The judge further held that defendant could choose the daughter's pediatrician but noted the parties should make all major decisions jointly. The judge further held that she would correct a typographical error as to the obligor and obligee for child support.[3] This appeal followed.

In his appeal, plaintiff argues the judge erred:

> (1) when she conflated the custody and relocation analyses instead of first determining custody;

---

[3] The record indicates that the judge entered a revised child support order on January 31, 2025. On February 4, 2025, the judge entered an amended order to correct another typographical error.

(2) in permitting defendant to relocate to Connecticut with the daughter and in granting 50/50 physical custody to the parties;

(3) in naming defendant as PPR because the parties were to share 50/50 parenting time and by basing her decision on the wrong legal standard;

(4) when she designated his status as a joint legal custodian and allowed defendant to unilaterally select the pediatrician;

(5) in permitting the parties to alternate claiming the daughter on their tax returns; and

(6) in imputing defendant with an income that is lower than her actual earnings before she quit her job.

In her cross-appeal, defendant argues the judge:

(1) correctly granted her removal application;

(2) correctly designated her as the PPR;

(3) properly exercised her discretion by permitting her to designate the child's pediatrician as the PPR;

(4) erred in awarding 50/50 physical custody because that ruling is inconsistent with the grant of the removal application and appointment of defendant as PPR and not in the best interests of the daughter;

(5) erred in designating New Jersey as the home state after initially and correctly determining that Connecticut is the daughter's home state;

(6) correctly imputed income to defendant but erred in imputing a minimum wage to plaintiff in the face of

18

uncontroverted evidence as to his education and experience; and

(7) exercised sound discretion in allowing the parties to alternate the tax exemption.

II.

Our review of a Family Part order is limited. See Cesare v. Cesare, 154 N.J. 394, 411 (1998). Generally, the family court's factual findings "are binding on appeal when supported by adequate, substantial[,] and credible evidence." Id. at 412 (citing Rova Farms Resort, Inc. v. Inv's Ins. Co. of Am., 65 N.J. 474, 484 (1974)). The scope of appellate review of a Family Part judge's findings following a bench trial is limited. N.T.V. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015) (citing Cesare, 154 N.J. at 411).

The conclusions of Family Part judges regarding child custody "are entitled to great weight and will not be lightly disturbed on appeal." DeVita v. DeVita, 145 N.J. Super. 120, 123 (App. Div. 1976) (citing Sheehan v. Sheehan, 51 N.J. Super. 276, 295 (App. Div. 1958)). Because we recognize "the special expertise of judges hearing matters in the Family Part," Parish v. Parish, 412 N.J. Super. 39, 48 (App. Div. 2010) (citing Cesare, 154 N.J. at 412), we will only disturb the Family Part's factual findings if "they are so wholly

insupportable as to result in a denial of justice." In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova Farms, 65 N.J. at 483-84).

An appellate court, in consequence, will only reverse the Family Part's conclusions if those conclusions are so "'clearly mistaken' or 'wide of the mark'" that they result in the denial of justice. Parish, 412 N.J. Super. at 48 (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). The Family Part's legal conclusions, however, are reviewed de novo. See N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 183 (2010).

"Discretionary determinations, supported by the record, are examined to discern whether an abuse of reasoned discretion has occurred." Ricci v. Ricci, 448 N.J. Super. 546, 564 (App. Div. 2017) (citing Gac v. Gac, 186 N.J. 535, 547 (2006)). It is well settled that, "[w]hen examining a trial court's exercise of discretionary authority, [appellate courts] reverse only when the exercise of discretion was 'manifestly unjust' under the circumstances." Newark Morning Ledger Co. v. N.J. Sports & Exposition Auth., 423 N.J. Super. 140, 174 (App. Div. 2011) (quoting Union Cnty. Improvement Auth. v. Artaki, LLC, 392 N.J. Super. 141, 149 (App. Div. 2007)).

An abuse of discretion occurs when a trial court's decision "'rested on an impermissible basis,' considered 'irrelevant or inappropriate factors,' . . . 'failed

to consider controlling legal principles or made findings inconsistent with or unsupported by competent evidence.'" Elrom v. Elrom, 439 N.J. Super. 424, 434 (App. Div. 2015) (citations omitted) (first quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002); then quoting Storey v. Storey, 373 N.J. Super. 464, 479 (App. Div. 2004)). Challenges to legal conclusions, as well as the trial court's interpretation of the law, are subject to de novo review. Ricci, 448 N.J. Super. at 565 (citing Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)).

Similarly, appellate courts "defer to the credibility determinations made by the trial court because the trial judge 'hears the case, sees and observes the witnesses, and hears them testify,' affording it 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare, 154 N.J. at 412). However, "[a]ll 'legal conclusions, and the application of those conclusions to the facts, are subject to our plenary review.'" Slutsky v Slutsky, 451 N.J. Super. 332, 344-45 (App. Div. 2017) (quoting Reese, 430 N.J. Super. at 568).

A parent's right to enjoy a relationship with his or her child is constitutionally protected. In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). "Parental rights, though fundamentally important, are not absolute." Id.

at 347. "In custody cases, it is well settled that the court's primary consideration is the best interests of the children." Hand v. Hand, 391 N.J. Super. 102, 105 (App. Div. 2007). Courts should apply the best interests analysis to determine cause under N.J.S.A. 9:2-4 in all removal disputes. Baures v. Lewis, 167 N.J. 91 (2001), overruled by Bisbing v. Bisbing, 230 N.J. 309, 312-13 (2017).

N.J.S.A. 9:2-4(c) provides:

> In making an award of custody, the court shall consider but not be limited to the following factors: the parents' ability to agree, communicate[,] and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children.
>
> [N.J.S.A. 9:2-4(c).]

In Pascale v. Pascale, 140 N.J. 583, 598 (1995), our Court held: "Although both [legal and physical custody] create responsibility over children

of [separated parents], the primary caretaker has the greater physical and emotional role."  The Court stated:

> [T]he many tasks that make one parent the primary, rather than secondary, caretaker [include]:  preparing and planning of meals; bathing, grooming, and dressing; purchasing, cleaning, and caring for clothes; medical care, including nursing and general trips to physicians; arranging for social interaction among peers; arranging alternative care, i.e., babysitting or daycare; putting [the] child to bed at night, attending to [the] child in the middle of the night, and waking [the] child in the morning; disciplining; and educating the child in a religious or cultural manner.
>
> [Id. at 598-99.]

The secondary caretaker role is equally important and exercised by means of a parenting time schedule befitting the circumstances of the case.  Id. at 597. We next apply these foundational principles to the matter before us.

III.

Plaintiff's Appeal

50/50 Physical Custody and Relocation

First, we address plaintiff's challenge to the judge's decision regarding 50/50 physical custody and relocation.  Plaintiff maintains the judge conflated the custody and relocation analyses instead of first determining custody. Plaintiff also argues the judge erred and "tainted" her entire decision by

23

reviewing the custody best interests factors against the "backdrop" of domestic violence and should have conducted a best interests analysis first before determining relocation.

We reject plaintiff's claim that the judge did not consider the daughter's best interests and viewed the case through the lens of domestic violence. The judge's findings under the statutory factors clearly considered whether those factors served the daughter's best interests. Indeed, several of the best interests factors focus on the parents' roles in the child's life or the parents' living and working situations. Regardless, this does not mean that the judge reverted to the now overruled <u>Baures</u> standard. Under <u>Baures</u>, the parent seeking to remove the child was required to prove the move was sought in good faith and not inimical to the child's best interests by addressing the following factors:

> (1) the reasons given for the move; (2) the reasons given for the opposition; (3) the past history of dealings between the parties insofar as it bears on the reasons advanced by both parties for supporting and opposing the move; (4) whether the child will receive educational, health[,] and leisure opportunities at least equal to what is available here; (5) any special needs or talents of the child that require accommodation and whether such accommodation or its equivalent is available in the new location; (6) whether a visitation and communication schedule can be developed that will allow the noncustodial parent to maintain a full and continuous relationship with the child; (7) the likelihood that the custodial parent will continue to

foster the child's relationship with the noncustodial parent if the move is allowed; (8) the effect of the move on extended family relationships here and in the new location; (9) if the child is of age, [their] preference; (10) whether the child is entering [their] senior year in high school at which point [they] should generally not be moved until graduation without [their] consent; (11) whether the noncustodial parent has the ability to relocate; (12) any other factor bearing on the child's interest.

[167 N.J. at 116-17.]

Crucially, at the outset of her opinion here, the judge expressly noted the applicable legal standard:

So, the legal standard the [c]ourt applies for the application, it is Bisbing. The [c]ourt also cites to Baures v. Lewis. The factors that the [c]ourt has to consider and the custody factors are pursuant to [N.J.S.A.] 9:2-4.

Thus, we are satisfied the judge acknowledged and considered the proper standard. In particular, the judge recognized the daughter's relocation was governed by Bisbing—our governing case law on relocation—and that the custody determination was governed by N.J.S.A. 9:2-4. Thereafter, the judge precisely evaluated the issues of physical custody and parenting time using the statutory best interests standard in N.J.S.A. 9:2-4(c) and then considered the removal application in light of those same factors, consistent with Bisbing.

Although some of the <u>Baures</u> factors implicate similar considerations under the N.J.S.A. 9:2-4(c) best interests factors, namely the: child's educational and general needs; parties' interactions with one another and the child; and the child's age and preferences, this does not persuade us that the judge adjudicated this case using the <u>Baures</u> standard. The judge's findings clearly considered the requisite statutory best interests factors. Moreover, she was not confined to the statutory factors, as N.J.S.A. 9:2-4(c) expressly provides Family Part judges "shall consider but not be limited to the [statutory] factors . . . ." Therefore, it was reasonable, indeed expected, that the judge would discuss the parties' living circumstances in New Jersey and Connecticut, their extended family relationships, and their working conditions. However, this did not transform the judge's findings into a <u>Baures</u> analysis.

We reject plaintiff's argument that the judge improvidently allowed the daughter to relocate to Connecticut based on domestic violence between the parties. The judge reasoned she was "compelled to start the analysis with the question as—or the issue—or the factor of domestic violence." The judge found there was a history of prior domestic violence here but declined to make findings as to whether the specific incidents alleged actually occurred. Nonetheless, the judge fairly concluded that the testimony demonstrated at least some history of

domestic violence existed between the parties. Moreover, the judge noted defendant's testimony about the domestic violence was "not fabricated," and because of the domestic violence, her request to relocate to Connecticut was not unreasonable. The judge rejected certain video evidence on this issue as not probative.

Importantly, the judge emphasized that in the days leading up to defendant's relocation, there was conflict in the parties' home, and thus defendant's move was "in good faith." Plaintiff cites R.K. v. F.K. for the proposition that even in cases where domestic violence occurred, the victim is not entitled to a presumption of custody. 437 N.J. Super. 58, 65 (App. Div. 2014). However, in the matter under review, the judge did not find any presumption of custody and merely considered the domestic violence history as one of several factors in her custody analysis.

The judge then addressed the statutory custody factors in N.J.S.A. 9:2-4(c). Regarding the parents' ability to agree, communicate and cooperate, the judge found the parties had an "extremely limited" ability to do so, and they were required to use Our Family Wizard. As to the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse, the judge noted that "much of the focus has been on . . . the

domestic violence." Regarding the interaction and relationship of the daughter with her parents, the court noted that she was "very young," and the interactions were consistently described as positive.

As to the safety of the child, the judge found no reason to believe that the daughter's safety was in jeopardy with either parent and no indication of physical abuse by either parent. The judge noted that the Division's case was determined to be unfounded. Regarding the preference of the child when of sufficient age and capacity to reason, the judge noted that the daughter was too young to have the capacity to reason.

As to the needs of the child, the judge found that her needs were met in both parties' homes. Regarding the stability of the home environment offered, the judge determined both homes were suitable for the daughter and rejected any claim that defendant's home was too crowded. In addition, the judge rejected any claim of conflict with defendant's brothers, highlighting there was no evidence that any bad behavior occurred in the daughter's presence.

Concerning the quality and continuity of the daughter's education, the judge found that the daughter was not old enough to attend school yet. As to the fitness of the parents, the judge found no "true concerns" that either parent was unsuitable or unfit. The judge again noted the history of domestic violence

28

between the parties but concluded neither parent was violent or unfit toward the daughter. The judge found that plaintiff showed a "positive and healthy and loving" relationship with the daughter.

Regarding the geographical proximity of the parents' homes, the judge found that difficulty arose because the parties lived ninety miles apart. As to the extent and quality of the time spent with the daughter prior to or subsequent to the separation, the judge noted that during the relationship, both parents worked during the day, but the daughter spent time with plaintiff daily.

As to the parents' employment responsibilities, the judge explained that plaintiff worked for his father earning $22,000 or $23,000 annually, with a flexible schedule, and defendant had recently quit her job. Further, the judge found that both parties were fully dependent on their parents. Finally, regarding the age and number of children, the judge noted that the daughter was twenty-one months old at the time.

After carefully considering these factors, the judge determined that both parents were fit and New Jersey favored "50/50 custody," and therefore, both parties were awarded equal parenting time. The judge then stated, "[n]ow going to the removal—the factors for removal . . . ." As to the reasons given for the move, the judge found that defendant went to Connecticut because of the

29

October 2023 incident. Next, the judge reiterated that the daughter was "very young," and the "educational opportunities are in equipoise." The judge noted that plaintiff's preferred preschool was not yet open, and defendant had not yet looked into educational opportunities for the daughter. The judge explained there was limited testimony as to the "health options" and whether or not New Jersey or Connecticut was better for the daughter. The judge found the daughter had no special needs or talents requiring individual attention in one state or another. The judge reasoned that a schedule could be developed to allow the parties to continue to have joint physical custody of the daughter. As to the effect of the move on any familial relations, the judge concluded that living in Connecticut would still allow both parties and their families to foster a relationship with the daughter. The judge mentioned that there was no expert testimony proffered as to what schedule was in the daughter's best interests.

The judge fixed a schedule of "one week on, one week off" to minimize driving between the parties' homes and noted minimizing the number of exchanges would be in the daughter's best interests and reduce conflict. We decline to second-guess the judge's application of the facts to the statutory factors because that is not our role on appeal. See R. 2:10-2. The judge's findings are supported by the adequate, substantial, and credible evidence in the

record, and she neither abused her discretion nor misapplied the law in weighing the N.J.S.A. 9:2-4(c) factors.

The circumstances presented do not persuade us that an order compelling both defendant and the daughter to move back to New Jersey is in the best interests of the daughter compared to the parenting time awarded plaintiff. By awarding a 50/50 physical custody arrangement, the judge comported with the public policy of N.J.S.A. 9:2-4, which promises a child "frequent and continuing contact with both parents . . . ." The record shows the parties' relationship endured tumult, and defendant's decision to remain in Connecticut was the result of the breakdown in the parties' relationship, rather than a desire to prevent plaintiff from having custody or parenting time. It was reasonable for defendant to stay in Connecticut as she did not have a means of residing independently with the daughter in New Jersey. The record supports the judge's determination.

## Home State

Plaintiff contends there was no basis for the judge to make a determination of the daughter's home state. However, in his complaint, plaintiff expressly sought a determination of the daughter's home state.[4] Thus, the judge rightfully

---

[4] Because plaintiff's amended complaint is not contained in the record, we cannot ascertain whether similar relief was sought.

adjudicated this issue consistent with her obligations under <u>Rule</u> 1:7-4(a).[5] The judge's responsibility under this <u>Rule</u> included an obligation to decide all critical issues. Pressler & Verniero, <u>Current N.J. Court Rules</u>, cmt. 1 on <u>R.</u> 1:7-4(a) (2026). We conclude plaintiff's argument lacks merit and is plainly inconsistent with the relief sought in his complaint.

PPR

Plaintiff next argues the judge erred in naming defendant PPR where the parties share equal parenting time. Again, we disagree.

The Child Support Guidelines define PPR and PAR as follows:

> (1) [PPR] - The parent with whom the child spends most of his or her overnight time. The primary residence is the home where the child resides for more than 50% of the overnights annually. If the time spent with each parent is equal (50% of overnights each), the PPR is the parent with whom the child resides while attending school . . . .

---

[5] <u>Rule</u> 1:7-4(a) provides:

> The court shall, by an opinion or memorandum decision, either written or oral, find the facts and state its conclusions of law thereon in all actions tried without a jury, on every motion decided by a written order that is appealable as of right, and also as required by <u>R[ule]</u> 3:29. The court shall thereupon enter or direct the entry of the appropriate judgment.

32

(2) [PAR] - This is the parent with whom the child resides when not living in the primary residence.

[Child Support Guidelines, Pressler & Verniero, Current N.J. Court Rules, Appendix IX-A to R. 5:6A, ¶ 14(b) (2026).]

A judge's designation of a specific parent as the PPR requires a "best interests of the child" inquiry. Bisbing, 230 N.J. at 335. The designation of either parent as PPR is significant, having "tangible, monetary effects." Benisch v. Benisch, 347 N.J. Super. 393, 396 (App. Div. 2002).

In Benisch, the judge awarded the parents equal parenting time, and the children spent an equal number of school nights with each parent such that, as here, the Guidelines' definition of PPR and PAR was not strictly applicable. 347 N.J. Super. at 395-96. However, we acknowledged that even in such a shared custody arrangement with equal parenting time, one party can be designated as PPR and the other as PAR. Id. at 400. Nonetheless, we remanded the matter for the judge to better articulate its reasons for designating one party as PPR. Ibid.

In her initial oral opinion, the judge here held that "both [parents] can be the [PPR]," though the initial order did not specifically designate a PPR. Thereafter, on reconsideration, the judge stated that her failure to designate a PPR had caused confusion and held defendant would be PPR, explaining:

[The designation of defendant as PPR] was contemplated in the [c]ourt's granting of the removal application, that was contemplated by the findings that were placed on the record, and the arguments that were set forth by defense in terms of why there was the removal. There were many arguments as to the history between the parties, the reason for the move and, again, the credibility findings, and that was part of why the [c]ourt granted the removal. And so in light of that, in furtherance of what the [c]ourt had intended to accomplish by entering the order on October 21[] following the decision, the defendant will be granted the [PPR].

Here, the judge's opinion on reconsideration, designating defendant as PPR was supported by the record and consistent with the rationale of her earlier decision, which included consideration of the daughter's best interests. Moreover, the judge clarified that although her initial failure to designate one parent as PPR had caused confusion, the subsequent designation of defendant as PPR was based on her earlier analysis of the custody factors and grant of the removal application. These findings are amply supported by the record, and we discern no error.

Plaintiff cites <u>Wunsch-Deffler v. Deffler</u>, 406 N.J. Super. 505, 508 (Ch. Div. 2009), for the proposition that the PPR and PAR designations do not apply when the time spent with each parent is equal. However, plaintiff mischaracterizes that case, which simply provided a formula for allocating costs

where the parents had equal parenting time. Id. at 506. Further, the plain language of the Child Support Guidelines permits the designation of a PPR when the time spent with each parent is equal. Child Support Guidelines, Pressler & Verniero, Current N.J. Court Rules, Appendix IX-A to R. 5:6A, ¶ 14(b) (2026). Therefore, we reject plaintiff's argument.

## The Daughter's Pediatrician

Plaintiff contends the judge erred in disregarding the joint legal custody provision by allowing defendant to unilaterally select the daughter's pediatrician based on the judge's designation of defendant as the PPR. Plaintiff maintains reversal is warranted because "the parties agreed to share joint legal custody," and the judge gave defendant "more power in this situation."

N.J.S.A. 9:2-4(a) provides that "[j]oint custody of a minor child to both parents, [] shall include [] provisions for consultation between the parents in making major decisions regarding the child's health, education and general welfare . . . ." However, in Boardman v. Boardman, 314 N.J. Super. 340, 348 (App. Div. 1998), we upheld a provision in a divorce judgment awarding joint legal custody with the mother as the primary custodial parent, who had final decision-making authority. Boardman made clear that "the legal authority and responsibility for making 'major' decisions regarding the children's welfare is

shared by both parents" in a joint custody arrangement. Ibid. However, the primary caretaker has "somewhat more authority to decide issues in the event of a disagreement." Ibid.

On reconsideration in this matter, the judge held that defendant could choose the daughter's pediatrician, despite the joint custody provision. We are satisfied the decision as to who would serve as the daughter's pediatrician was plainly within the judge's afforded discretion. Saliently, in light of the judge's designation of defendant as PPR, and consistent with Boardman, we agree defendant should have "somewhat more authority" to make this decision. Therefore, we find no reversible error. 314 N.J. Super. at 348.

## Tax Exemption

Plaintiff next argues that the judge erred in permitting the parties to alternate claiming the daughter as an exemption on their tax returns. Plaintiff alleges this decision is unsupported because defendant was unemployed at the time of the hearing. Plaintiff's argument lacks merit.

Under New Jersey law, "[t]he trial court may exercise its discretion in allocating tax exemptions, subject to acceptance by the Internal Revenue Service." Heinl v. Heinl, 287 N.J. Super. 337, 352-53 (App. Div. 1996). Here, the judge held that the parties would alternate claiming the daughter as a

dependent on their tax returns until her emancipation, with plaintiff claiming her in even years, and defendant claiming her in odd years. The judge reasonably exercised her broad discretion, as permitted in Heinl, to order the parties to alternate claiming the daughter on their tax returns. While plaintiff asserts this decision was erroneous because defendant was unemployed at the time of trial, she testified that she was seeking employment and did not intend to remain unemployed. Therefore, there was no error or abuse of discretion.

Imputed Income

Finally, plaintiff contends that the judge erred in imputing to defendant an income that is lower than what she earned before quitting her job. He argues that the judge imputed $50,000 to her per year, meanwhile she was earning $65,000 when she quit her job.

The court may impute income to a parent who is voluntarily unemployed. Caplan v. Caplan, 182 N.J. 250, 268-69 (2005); Strahan v. Strahan, 402 N.J. Super. 298, 312 (App. Div. 2008). "Imputation of income is a discretionary matter not capable of precise or exact determination but rather requiring a trial judge to realistically appraise capacity to earn and job availability." Storey, 373 N.J. Super. at 474. Accordingly, there are no bright line rules that govern the imputation of income. Ibid. A trial court's imputation of income for support

purposes is subject to an abuse of discretion standard. <u>Tash v. Tash</u>, 353 N.J. Super. 94, 99 (App. Div. 2002).

Here, the judge imputed to defendant an annual income of $50,000. In doing so, the judge acknowledged defendant had previously received a raise, such that her salary was approximately $64,000 or $65,000, shortly before leaving her job, but held defendant's income should be determined "prior to the raise, because I don't think she really got the benefit of the raise."

We conclude, the judge did not abuse her discretion. The imputed sum of $50,000 was close to defendant's $55,000 annual salary prior to her raise. Moreover, the judge reasoned that because defendant left her job shortly after receiving the raise, she did not truly receive the benefit of the raise. The record supports that determination. Further, this decision reasonably reflects the fact that defendant might be unable to secure future income at $65,000 after leaving her job, particularly having moved outside the immediate New York City metropolitan area. Therefore, we reject plaintiff's argument.

A-1823-24

IV.

Defendant's Cross-Appeal

Custody

Defendant argues in her cross-appeal that the judge erred in ordering and then failing to reconsider the award of "50/50 physical custody" because the judge should have granted her additional parenting time to facilitate the daughter's enrollment in school in the near future. Defendant argues that the parenting time arrangement ordered is inconsistent with the judge's grant of her removal application and appointment as PPR. We disagree.

New Jersey courts will not issue advisory opinions or rule on hypothetical situations. G.H. v. Township of Galloway, 199 N.J. 135, 136 (2009). "The judicial function operates best when a concrete dispute is presented to the courts." Ibid. Further, our courts will not decide cases based on facts that are "undeveloped or uncertain." N.J. Ass'n for Retarded Citizens, Inc. v. N.J. Dep't of Hum. Servs., 89 N.J. 234, 241 (1982).

On reconsideration, the judge here denied defendant's request for additional parenting time once the daughter was enrolled in school, finding that this ruling should abide by the event because it was "completely hypothetical."

39

The judge was correct in her analysis and rightfully declined to address custody and parenting time in light of the record, which demonstrated that the daughter was not yet enrolled in school, and the parties were uncertain where and when she would begin school. Such a ruling on this issue would have been purely speculative as the school's location and schedule were not before the judge. We reiterate the judge's custody ruling was amply supported by the evidence, and we will not disturb it.

Home State

Defendant next argues that the judge erred in designating New Jersey as the daughter's home state. We are unpersuaded.

The UCCJEA prohibits simultaneous custody proceedings in separate states or countries and instead establishes a preference for the resolution of custody disputes by courts of the child's "home state." Fall & Romanowski, Child Custody, Protection & Support § 27:11 (2026). N.J.S.A. 2A:34-54 provides that "home state" is defined as

> the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned. A period of temporary absence of any of the mentioned persons is part of the period.

[N.J.S.A. 2A:34-54.]

Again, plaintiff's initial complaint sought a determination of the daughter's home state. Therefore, the issue was before the judge. In their November 2023 consent order, the parties agreed that the daughter's home state would be New Jersey.[6] The judge ultimately held on reconsideration that New Jersey would be considered the daughter's home state despite permitting her relocation to Connecticut and initially ruling Connecticut would be the home state.

We affirm the judge's determination to regard New Jersey as the daughter's home state. In November 2023, even after relocating with the daughter to Connecticut, but prior to filing her counterclaim for removal, defendant conceded that New Jersey was the home state. Further the record indicates that, consistent with N.J.S.A. 2A:34-54, the daughter had lived in New Jersey for more than six consecutive months immediately before the commencement of the complaint filing for child custody. Accordingly, the

---

[6] Defendant's counterclaim for removal later sought to change the home state designation to Connecticut.

A-1823-24

judge had subject matter jurisdiction to decide the parties' custody dispute under N.J.S.A. 2A:34-65(a).[7]

Defendant argues that the daughter lived in Connecticut for six months prior to the judge's granting of the removal application that Connecticut should be deemed her home state. However, defendant ignores the plain language of the statute, which provides that the home state is determined based on the child's residence "before the commencement of a child custody proceeding." N.J.S.A. 2A:34-54. It is undisputed this custody proceeding began in early November 2023, and the daughter lived in New Jersey until she was removed to Connecticut in late October 2023. Therefore, defendant's argument is unavailing.

Imputed Income

Defendant next argues that the judge erred in imputing only minimum wage to plaintiff in light of his education, which included a college degree and his work experience. Again, "[i]mputation of income is a discretionary matter not capable of precise or exact determination but rather requiring a trial judge

---

[7] The daughter's relocation to Connecticut in the few days preceding plaintiff's filing of this action does not defeat New Jersey's status as home state. See Dalessio v. Gallagher, 414 N.J. Super. 18, 23-24 (App. Div. 2010) (rejecting a claim that a relocation in the days prior to the filing of the complaint negated home state status).

to realistically appraise capacity to earn and job availability." <u>Storey</u>, 373 N.J. Super. at 474. There are no bright line rules that govern the imputation of income. <u>Ibid.</u> A trial court's imputation of income for support purposes is subject to an abuse of discretion standard. <u>Tash</u>, 353 N.J. Super. at 99.

Here, the judge's imputation of minimum wage was consistent with the evidence in the record, which indicated that plaintiff earned only $22,168 per year while working for his father's construction company. While this annual income appears to be below minimum wage for full-time employment, by imputing a minimum wage of forty hours per week, the judge rightly exercised her discretion to approximate plaintiff's income at a reasonable rate for construction work.

To the extent we have not addressed a particular argument, it is because either our disposition deems it unnecessary or the argument was without sufficient merit to warrant discussion in a written opinion. <u>R.</u> 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1823-24